IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EVENTS MEDIA NETWORK, INC. | NO. 12-CV-02365 |
| Plaintiff, | |
| v. | |
| THE WEATHER CHANNEL INTERACTIVE, INC., THE WEATHER CHANNEL INTERACTIVE, LLC, and THE WEATHER CHANNEL, LLC | ASSIGNED TO THE HONORABLE PETRESE B. TUCKER, J. |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff, Events Media Network, Inc. ["EMNI"], by and through its undersigned counsel, files this Amended Complaint against Defendants, The Weather Channel Interactive, Inc., The Weather Channel Interactive, LLC and The Weather Channel, LLC.  In support thereof, Plaintiff avers as follows:

## PARTIES

1.     Plaintiff is Events Media Network, Inc., a Delaware Corporation, with a business address at 10 Lexington Court, Shamong, New Jersey 08088.

2.     Defendant, The Weather Channel Interactive, Inc. was a Georgia corporation with a principal place of business at 300 Interstate North Parkway, Atlanta, Georgia 30339.

3.     On December 21, 2010, Defendant, The Weather Channel Interactive, Inc., converted into a Georgia Limited Liability Company and assumed the name The Weather Channel Interactive, LLC, and continued to maintain its principal place of business at the same address.

4.      Sometime thereafter, Defendant, The Weather Channel Interactive, LLC, changed its name to The Weather Channel, LLC, still maintaining its principal place of business at the same address.

5.      Based upon information and belief, EMNI avers that The Weather Channel, LLC is a limited liability company wholly owned by TWCC Holding Corp.

6.      Based upon information and belief, EMNI avers that Defendant, The Weather Channel Interactive, LLC, a/k/a Defendant, The Weather Channel, LLC,. is the corporate successor of Defendant, The Weather Channel Interactive, Inc., acquiring all of its assets and liabilities.  Accordingly, for purposes of the claims stated in this complaint, EMNI will treat all three fictitious names as constituting one and the same entity, which will hereinafter be referred to as "TWCi."

## JURISDICTION AND VENUE

7.      Jurisdiction and venue are proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1332, in that this is an action between citizens of different states, with an amount in controversy allegedly exceeding $75,000, exclusive of interest and costs, and in that the TWCi regularly conducts business in Philadelphia in that, as just one example, a substantial number of the 100+ million U.S. households that receives The Weather Channel's cable networks as part of their cable television service are located in this county.

2

## FACTS

### EMNI's Trade Secrets And Confidential Information

8.      EMNI is in the business of collecting, reviewing and distributing information in the nature of detailed schedules and related information for various local and national events and attractions ["Information"].

9.      By virtue of its efforts and expenditures, EMNI has achieved competitive advantage over providers of similar services, by developing and preserving the confidentiality of certain proprietary information.

10.      As a result of the foregoing, although none of the individual bits of data gathered together by EMNI is confidential, once "gathered together" from various sources utilizing a custom built database built for EMNI's exclusive use into the format created by EMNI, this constitutes trade secrets, confidential Information and intellectual property of EMNI and, as a consequence, is proprietary information owned by EMNI.

11.      EMNI's Trade Secret and Confidential Information is not information that is known to its competitors and is not publicly known or available.

12.      Even if the Information from EMNI as its source is not proprietary, for purposes of this action TWCi is estopped from contending that this Information is not proprietary because it has contractually agreed and has admitted, as is alleged below, that this Information is proprietary.

### Content License Agreement Between TWCi and EMNI

13.      TWCi maintains several websites on the World Wide Web, one being www.weather.com, wherein it provides current meteorological conditions and forecasts, and related maps, news, weather, travel and other information.

3

14.     As of May 1, 2008 EMNI and TWCi entered into the latest Content License Agreement ["Content License Agreement"] following an approximately 6 year relationship in which the parties had been operating under previous license agreements,  in which EMNI agreed to collect Information and make same, including updates, available to TWCi pursuant to a schedule.  A true and correct copy of that contract is attached hereto as Exhibit A and incorporated by reference herein.

15.     Pursuant to Exhibit A of the Content License Agreement, EMNI had agreed to provide on a daily basis to TWCi the following Information:

### "Data Fields to be Provided for Each Event

All data fields that are gathered about each event, which includes, but is not limited to, the following:

Event_no, Event_name, *Location, *Address1, *Address2, City, State, Zip, Ethnics, Category, *Attendance, *Description, Open_date, Close_date, Area1, Exchange1, Number1, *Fax_area1, *Fax_exchange1, *Fax_number1, *Area2, *Exchange2, *Number2, *Ticket_info, *Hours, Country, DMA, Home_Team, Away_Team

(fields marks with "*" are present if available, as often as possible, and when applicable on an event by event basis)."

16.     Contained within Section 3 of the Content License Agreement is the following language:

"Nothing contained herein may be construed to give TWCi the right without further written consent of [Events] to take the information or any part of it and incorporate it into other programs for uses **other than event and attractions listings**.  To the extent any such use has been made of the information under any Agreement between the parties, [Events] consents to the continued use of such information for such purpose **only and only as long as this Agreement remains in full force and effect**."

[bold added].

17.     Section 4 of the Content License Agreement provides:

> **4.      Proprietary Rights.** TWCi acknowledges and agrees that
> the information, and all right, title and interest therein, is and shall
> remain the exclusive property of [EMNI].  [EMNI] shall have the
> right to obtain and to hold in its own name copyrights, registrations
> or such other protection as may be appropriate to protect the
> information. … The incorporation of [EMNI's] Information into a
> derivative work by TWCi shall accord no right to TWCi to use the
> Information, or the derivative work if that is dependent on the
> Information, **subsequent to the termination of this
> Agreement…**"

[bold added with the exception of the heading].

18.     Pursuant to Section 6 of the Content License Agreement, the Information is to be

treated as "**Confidential Information**":

> **6.      Confidentiality.**  For purposes of this Agreement, the term
> "**Confidential Information**" shall mean all technical, business,
> and other information of either Party or such Party's affiliates
> disclosed to or obtained by the other Party, whether prior to, on or
> after of the date of this Agreement, that derives economic value,
> actual or potential from not being generally known to others,
> including, without limitation, any technical or non-technical data,
> … research and development … of such Party.  Confidential
> Information also includes the terms and conditions of this
> Agreement. … The restrictions contained in this section shall
> survive any expiration or termination of this Agreement, but shall
> not apply to any information that does not constitute a trade secret
> under applicable law three years after the termination or expiration
> of this Agreement."

19.     Paragraph 11(h) of the Content License Agreement provides in part: "**Survival.**

The provisions contained in **sections 3, 4** … **6** … shall survive the expiration or termination of

this Agreement for any reason." [bold in original].

20.     Paragraph 11(i) of the Content License Agreement contains a choice of law

provision stating that it is "governed by the laws of the State of Georgia, without regard to its

conflict of law rules."

21.     In view of the language of the Content License Agreement quoted above, TWCi agreed by contract that any and all Information provided to it by EMNI was to be treated as proprietary as the property of EMNI regardless of whether it is considered proprietary under the intellectual property laws of the State of Georgia and/or the United States of America, although it is the contention of EMNI that all Information provided by it pursuant to the terms of the Content License Agreement is proprietary and owned by it.

22.     TWCi and EMNI entered into an Amendment To Content License Agreement, made as of November 1, 2010, a true and correct copy of which is attached hereto as Exhibit B.

23.     Upon the termination of the time period covered by the Amendment To Content License Agreement, the Content License Agreement expired, based upon its own terms, on May 1, 2011, although certain provisions survived its expiration.

## TWCi's Wrongful Conduct

24.     Subsequent to the termination of the Content License Agreement, EMNI  learned that TWCi has taken the Information supplied by Events and other properties and has used it for its own other purposes that have nothing whatsoever to do with event and attractions listings, contrary to the purpose and intentions of this agreement, and is doing so without Events' permission, and that such conduct has continued subsequent to the termination of the Content License Agreement.

25.     Not only is the conduct alleged in the paragraph next above in breach of the Content License Agreement, it is an infringement upon EMNI's intellectual property rights.

26.     As just one example of this infringement upon EMNI's intellectual property rights, the incorporation of this Information by TWCi has allowed it to map weather observation stations and forecast points to create custom forecasting and reporting for those locations.

27.     Moreover, this set of geo-locations and "weather mappings," were, at least at one time, contained within the master location database table within the weather.com master database and application system, known as "BATMAN" ("Big Application That's Missing A Name"), which database and supporting applications contain all location information and the applications that deliver those data to the various products on weather.com and The Weather Channel Network.

28.     As another example of this infringement upon EMNI's intellectual property rights, TWCi has built numerous products using EMNI's proprietary set of locations, which are part of the Information, that TWCi did not otherwise have.

29.     None of the TWCi activities alleged in paragraphs 23 – 27 above were authorized under the Content License Agreement, nor are they authorized now that this agreement has expired.

30.     EMNI did not know, and could not with the exercise of reasonable diligence have known, of TWCi's unauthorized use until after the termination of the Content License Agreement.

31.     Within the last year, Maria King, president of EMNI, had a discussion with Chris Ritger of TWCi with respect to TWCi's wrongful use of EMNI's proprietary Information, which resulted in an e-mail sent to her on August 15, 2011 at 11:31 a.m. eastern daylight savings time by Chris Ritger, on behalf of and with the full authority of TWCi, in which he admits that TWCi continues to use EMNI's Information, does not dispute that it constitutes proprietary information owed by EMNI, but justifies such conduct based upon the incorrect premise that the Content License Agreement contains a surviving provision granting TWCi authority to continue

to use EMNI's Information upon its termination.  A true and correct copy of that e-mail is attached here as Exhibit C and incorporated by reference herein.

32.     If TWCi now takes the legal position that the Information is not proprietary and/or that EMNI has no property rights in the Information, then that position would be inconsistent with the position taken by Ritger in his August 15, 2011 e-mail to King made on behalf of TWCi.

33.     Periodic Google search results and searches conducted on www.weather.com clearly show usage of EMNI Information up to and including sometime in December 2011, notwithstanding previous claims made by TWCi that it had ceased to use EMNI's Information, when TWCi removed all public links to such Information.

34.     Based upon information and belief, EMNI avers that TWCi continues to use the Information, for purposes never authorized under that agreement.

35.     Simply removing all of the Information from public view is not sufficient to put TWCi in compliance with its post-termination obligations under the Content License Agreement; to the contrary, it is obligated to erase **all** of Information from all of its servers.

36.     Moreover, the language quoted above in Paragraph 16 of this complaint from Section 3 of the Content License Agreement makes it plain that TWCi no longer has permission to use this Information, regardless of whether it had permission to use this information in all the manners it was used before the agreement terminated.

37.     The Information is of great value to TWCi because, based upon information and belief, EMNI alleges that the actual cost to TWCi to delete and replace all of this information would be substantial, not just for the removal process but also in acquiring, re-adapting the new

information and entering and testing the new data from other sources to make up for the Information.

38.     TWCi's continued use of the data shows a belief on the part of TWCi that the data has a clear value to TWCi; otherwise TWCi would have removed it once the contract ended.

## Harm Being Sustained by EMNI

39.     As further demonstration of the value of the Information to TWCi, in the last six months of the Content License Agreement, TWCi paid as additional compensation in the form of providing an added "partner" link on the footer of every page on www.weather.com for EMNI's website, the value of which  was determined by an independent auditing company hired by TWCi and reported to EMNI as worth approximately $26,000 per month.

40.     In addition to the $3,500 paid monthly in cash by TWCi and the  $26,000 per month value of the "partner" link, EMNI was receiving in substance remuneration of $29,000 per month for TWCi's use of Event Information only, which use had been previously authorized under the Content License Agreement, for which it ceased paying for upon the termination of the Content License Agreement.

41.     In view of the foregoing, TWCi clearly shows a wanton disregard for EMNI's rights as set forth in the Content License Agreement and a pattern of discrepancies with regard to the facts surrounding the purported deletion of the data from TWCi computers.

## The Arbitration Provision of the Content License Agreement Does Not Apply

42.     The Content License Agreement contains an arbitration provision in Section 11(a); however, that provision does not apply to the present dispute because that provision does

not survive the termination of this agreement (See, Paragraph 11(h)), which means that EMNI can pursue a claim for damages in the present action.

43.   Moreover with respect to the claims for both preliminary and permanent injunctive relief, the arbitration provision does not apply also for the additional reason that this agreement expressly excludes from the arbitration requirement, claims for injunctive relief.

44.   Specifically, Section 11(a) provides: "None of the provisions of this **Section 11(a)** shall prejudice the right of either Party to any Dispute to apply to <u>any court of appropriate jurisdiction</u> for temporary or permanent injunctive or other equitable relief." [underline added].

45.   This court is an "appropriate jurisdiction" because jurisdiction and venue are proper here and because the parties did not agree in the Content License Agreement to limit litigation between them to a particular state and the venue provision contained in that agreement does not apply because that provision did not survive its termination.

## COUNT I
## CONVERSION

46.   The averments set forth in Paragraphs 1 through 45 hereof are incorporated by reference herein as if set forth in their entirety.

47.   TWCi has since the termination of the Content License Agreement and, based upon information and belief, continues to use EMNI's trade secret and confidential Information without its authority.

48.   EMNI has ownership and immediate possessory right to such files.

49.   The actions of TWCi constitutes a conversion.

50.   By the actions described above, TWCi has wrongfully exercised dominion and/or control over EMNI property.

51.     The above-described actions were willful and intentional and are the proximate cause of damages to EMNI.

52.     TWCi does not have the legal right, or good faith claim to a colorable legal right, to take the above-described actions.

53.     As a proximate result of the actions of TWCi, EMNI has been harmed, including but not limited to its potential inability to offer an exclusive license to a third party, and has suffered damages; such damages have not been fully determined because the conduct complained of here is ongoing and, therefore, so too are EMNI's damages.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS
## PURSUANT TO GEORGIA TRADE SECRETS ACT – INJUNCTIVE RELIEF

54.     The averments set forth in Paragraphs 1 through 53 hereof are incorporated by reference herein as if set forth in their entirety.

55.     EMNI has suffered an irreparable injury and is without an adequate remedy at law.

56.     EMNI seeks injunctive relief pursuant to Georgia Trade Secrets Act, OCGA § 10-1-760, et seq. ["GTSA"].

57.     The Information constitutes trade secrets pursuant to the GTSA.

58.     Pursuant to OCGA § 10-1-761(4)(B), EMNI has made reasonable efforts to maintain the secrecy of the Information.

59.     EMNI's Information as trade secrets derives economic value from not being generally known to persons outside of EMNI and its licensees who could obtain economic value from disclosure or use.

60.     TWCi knew or had reason to know that EMNI expected them to maintain the secrecy of the trade secrets and to cease using them upon the termination of the Content License Agreement.

61.     TWCi knew or had reason to know that EMNI derived economic benefit from maintaining the secrecy of its Information, which are trade secrets, and preventing their disclosure or use by third parties and, in particular, providers of similar services.

62.     TWCi's conduct as alleged above is in violation of the GTSA, as follows:

    a.     It knew or had reason to know that EMNI expected it not to use its Information beyond that authorized under the Content License Agreement;

    b.     It is using the trade secrets for its own benefit without express or implied consent of EMNI;

    c.     It is using the trade secrets despite knowing that its use exceeds the authority given it pursuant to the Content License Agreement.

63.     The above acts were intentional and willful, and are the proximate cause of damages to EMNI.

64.     TWCi does not have the legal right, nor good faith claim to a colorable legal right, to take the above-described actions.

65.     EMNI is entitled to injunctive relief as a result of TWCi's misappropriation of EMNI's trade secret Information pursuant to the GTSA.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS PRIOR TO TERMINATION OF THE CONTRACT PURSUANT TO GEORGIA TRADE SECRETS ACT

66.     The averments set forth in Paragraphs 1 through 65 hereof are incorporated by reference herein as if set forth in their entirety.

67.     EMNI seeks damages pursuant to Georgia Trade Secrets Act, OCGA § 10-1-760, et seq. ["GTSA"].

68.     The Information constitutes trade secrets pursuant to the GTSA.

69.     Pursuant to OCGA § 10-1-761(4)(B), EMNI has made reasonable efforts to maintain the secrecy of the Information.

70.     EMNI's Information as trade secrets derives economic value from not being generally known to persons outside of EMNI and its licensees who could obtain economic value from disclosure or use.

71.     TWCi knew or had reason to know that EMNI expected them to maintain the secrecy of the trade secrets and to use them only in accordance with the Content License Agreement.

72.     TWCi knew or had reason to know that EMNI derived economic benefit from maintaining the secrecy of its Information, which are trade secrets, and preventing their disclosure or use by third parties and, in particular, providers of similar services.

73.     Prior to termination of the Content License Agreement, TWCi used the Information for purposes not and never authorized by the Agreement.

74.     TWCi's conduct as alleged above is in violation of the GTSA, as follows:

    a.     It knew or had reason to know that EMNI expected it not to use its Information beyond that authorized under the Content License Agreement;

    b.     It is using the trade secrets for its own benefit without express or implied consent of EMNI;

    c.     It used the trade secrets despite knowing that its use exceeded the authority given it pursuant to the Content License Agreement.

13

75.     The above acts were intentional and willful, and are the proximate cause of damages to EMNI.

76.     TWCi does not have the legal right, nor good faith claim to a colorable legal right, to take the above-described actions.

77.     EMNI is entitled to recover damages as a result of TWCi's misappropriation of EMNI's trade secret Information pursuant to the GTSA.

78.     EMNI is entitled to recover exemplary damages as a result of TWCi's willful and malicious misappropriation of EMNI's trade secret Information pursuant to the GTSA.

79.     EMNI is entitled to recover attorney fees as a result of TWCi's misappropriation of EMNI trade secret Information pursuant to the GTSA.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS POST TERMINATION OF THE CONTRACT PURSUANT TO GEORGIA TRADE SECRETS ACT

80.     The averments set forth in Paragraphs 1 through 79 hereof are incorporated by reference herein as if set forth in their entirety.

81.     EMNI seeks damages pursuant to Georgia Trade Secrets Act, OCGA § 10-1-760, et seq. ["GTSA"].

82.     The Information constitutes trade secrets pursuant to the GTSA.

83.     Pursuant to OCGA § 10-1-761(4)(B), EMNI has made reasonable efforts to maintain the secrecy of the Information.

84.     EMNI's Information as trade secrets derives economic value from not being generally known to persons outside of EMNI and its licensees who could obtain economic value from disclosure or use.

14

85. TWCi knew or had reason to know that EMNI expected them to maintain the secrecy of the trade secrets and to cease using them upon the termination of the Content License Agreement.

86. TWCi knew or had reason to know that EMNI derived economic benefit from maintaining the secrecy of its Information, which are trade secrets, and preventing their disclosure or use by third parties and, in particular, providers of similar services.

87. TWCi continued to use the Information following the termination of the Content License Agreement.

88. TWCi continues to use such Information.

89. TWCi's conduct as alleged above is in violation of the GTSA, as follows:

      a. It knew or had reason to know that EMNI expected it not to use its Information beyond that authorized under the Content License Agreement;

      b. It is using the trade secrets for its own benefit without express or implied consent of EMNI;

      c. It is using the trade secrets despite knowing that its use exceeds the authority given it pursuant to the Content License Agreement.

90. The above acts were intentional and willful, and are the proximate cause of damages to EMNI.

91. TWCi does not have the legal right, nor good faith claim to a colorable legal right, to take the above-described actions.

92. EMNI is entitled to recover damages as a result of TWCi's misappropriation of EMNI's trade secret Information pursuant to the GTSA.

93. EMNI is entitled to recover exemplary damages as a result of TWCi's willful and malicious misappropriation of EMNI's trade secret Information pursuant to the GTSA.

15

94.     EMNI is entitled to recover attorney fees as a result of TWCi's misappropriation of EMNI trade secret Information pursuant to the GTSA. **COUNT V**

## BREACH OF CONTRACT OBLIGATIONS

95.     The averments set forth in Paragraphs 1 through 94 hereof are incorporated by reference herein as if set forth in their entirety.

96.     As described above, TWCi has failed and refused to comply with the obligations set forth in the Content License Agreement.

97.     As described above, TWCi used EMNI's Information for uses not authorized pursuant to the Content License Agreement prior to the termination of such Agreement.

98.     EMNI was unaware of this unauthorized use until after termination of the Content License Agreement.

99.     TWCi's failure and refusal to comply with the obligations set forth in the Content License Agreement has caused harm to EMNI.

100.     TWCi's failure and refusal to comply with the obligations set forth in the Content License Agreement has caused EMNI to sustained damages.

101.     EMNI is entitled to damages resulting from TWCi's breach of the Content License Agreement.

## COUNT VI
## BREACH OF CONTRACT POST-TERMINATION OBLIGATIONS – INJUNCTIVE RELIEF

102.     The averments set forth in Paragraphs 1 through 101 hereof are incorporated by reference herein as if set forth in their entirety.

103.     As described above, TWCi has failed and refused to comply with the post-termination obligations set forth in the Content License Agreement.

104.    TWCi's failure and refusal to comply with the post-termination obligations set forth in the Content License Agreement is causing irreparable harm and damage to EMNI.

105.    EMNI has no adequate remedy at law to protect its substantial business and property rights and the damages from TWCi's failure to comply with the post-termination obligations are considerable and continuing.

106.    EMNI is entitled to preliminary and permanent injunctive relief enforcing all post-termination obligations of the Content License Agreement.

## COUNT VII
## BREACH OF CONTRACT OBLIGATIONS -- DAMAGES

107.    The averments set forth in Paragraphs 1 through 106 hereof are incorporated by reference herein as if set forth in their entirety.

108.    As described above, TWCi has failed and refused to comply with the post-termination obligations set forth in the Content License Agreement.

109.    TWCi's failure to comply with the post-termination obligations set forth in the Content License Agreement constitutes of breach of the Agreement.

110.    TWCi's failure and refusal to comply with the obligations set forth in the Content License Agreement has caused harm to EMNI.

111.    TWCi's failure and refusal to comply with the obligations set forth in the Content License Agreement has caused EMNI to sustained damages.

112.    EMNI is entitled to damages resulting from TWCi's breach of the Content License Agreement after the termination of such agreement; such damages have not been fully determined because the conduct complained of here is ongoing and, therefore, so too are EMNI's damages.

## PRAYER FOR RELIEF

WHEREFORE, Events Media Network, Inc. requests the following relief:

1.      A preliminary and permanent injunction pursuant to GTSA, § 10-1-76 against The Weather Channel Interactive, Inc., The Weather Channel Interactive, LLC and The Weather Channel, LLC, their agents, servants, employees and attorneys, and all others in active concert or participation with them, preventing them from using any or all of the Information;

2.      A preliminary and permanent injunction pursuant to GTSA, § 10-1-76 against The Weather Channel Interactive, Inc., The Weather Channel Interactive, LLC and The Weather Channel, LLC, their agents, servants, employees and attorneys, and all others in active concert or participation with them, enforcing all post-termination obligations of the Content License Agreement, specifically the deletion by TWCi of Information from all of its data basis;

3.      Award of all permissible damages under GTSA, § 10-1-763 including an award of exemplary damages;

4.      Award of damages resulting from EMNI's pre-termination breach of the Content License Agreement;

5.      Award of damages resulting from EMNI's post-termination breach of the Content License Agreement;

6.      To the extent that damages recoverable for conversion exceed or differ from damages recoverable un GTSA, § 10-1-763, an award of damages resulting from conversion.

7.      EMNI's costs, disbursements, and attorneys' fees incurred in this action; and

8.   Such other and further relief as the Court deems just and proper.

**ECKERT SEAMANS CHERIN
& MELLOTT, LLC**

Dated:  May 15, 2012                    By:   /s/Jeffrey P. Lewis
                                              Jeffrey P. Lewis, Esquire
                                              PA I.D. No. 27586
                                              Two Liberty Place
                                              50 South 16th Street, 22nd Floor
                                              Philadelphia, PA  19102
                                              215-851-8400

                                              *Attorney for Plaintiff, Events
                                              Media Network, Inc.*

*M1043561*

## CERTIFICATE OF SERVICE

Jeffrey P. Lewis, Esquire, hereby certifies that on this 15th day of May, 2012, he caused a true and correct copy of the foregoing Complaint to be filed electronically with the Court and served via United States Mail, first class, postage prepaid, upon the following counsel:

James H. Steigerwald
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103


/s/ Jeffrey P. Lewis
JEFFREY P. LEWIS, ESQUIRE

# EXHIBIT "A"

## CONTENT LICENSE AGREEMENT

**THIS AGREEMENT** is effective as of May 1, 2008 (the **"Effective Date"**), and is between THE WEATHER CHANNEL INTERACTIVE, INC., a Georgia corporation (hereinafter **"TWCi"**), and EVENTS MEDIA NETWORK, INC., a Delaware corporation (**"Supplier"**). TWCi and Supplier may be referred to individually as a **"Party"** and collectively as the **"Parties."**

**Preliminary Statement.** TWCi through its network of branded, co-branded or location specific websites (hereafter "Platforms") is in the business of providing current meteorological conditions and forecasts, and related maps, news, weather, travel, business, recreational, sports, health, safety, scientific, historical and other information through all types of electronic media, including on the World Wide Web, through wireless devices, through telephones and through email services. Supplier is in the business of collecting, reviewing, and distributing the information described on **Attachment A** attached hereto (the **"Information"**), and has the experience and expertise necessary to provide such Information. Supplier desires to provide to TWCi such Information, and TWCi desires to obtain such Information for its use and distribution, all on the terms and conditions contained in this Agreement.

**NOW, THEREFORE,** for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **Collection and Delivery of Information.**

        (a)      <u>Collection of Information</u>  Subject to the terms and conditions of this Agreement, Supplier will collect the Information during the term of this Agreement. The description of Information may be changed upon the mutual written agreement of the parties by appropriately amending **Attachment A.**

        (b)      <u>Schedule and Format.</u> Supplier shall make the Information, including updates thereto, available to TWCi on the schedule (the **"Schedule"**), by the method of delivery and in the form and format specified on **Attachment A,** as the same may be reasonably modified by TWCi from time to time upon prior notice to Supplier. Prior to transmission, Supplier shall ensure that the Information is current, complete and accurate. If all of the Information scheduled for receipt has not been received by TWCi or is unintelligible, or otherwise does not conform to the requirements of this Agreement, Supplier shall promptly retransmit such missing, unintelligible or non-conforming Information, and notify TWCi immediately of the problem.

        (c)      <u>Hardware Maintenance Obligations.</u>  Supplier, at its cost, shall maintain at all times in good working order and condition such equipment, computer software and other facilities (the **"Supplier System"**) as are necessary to perform its obligations under this Agreement. TWCi retains the right to change or modify its hardware, software, methodologies and/or procedures pursuant to which TWCi receives Information, and if TWCi makes any such change or modification, Supplier, at its cost, will make such changes and modifications to the Supplier System as may be required to remain compatible with TWCi and its systems; provided, however, that TWCi shall give Supplier as much prior notice thereof as is reasonably practicable under the then existing circumstances; provided, further, that if such changes and modifications will require material expenditures by Supplier, it shall notify TWCi and may terminate this Agreement on 90 days advance written notice.

        (d)      <u>Manner of Information Transmission.</u>  The parties contemplate that the Information will be provided directly to TWCi's computer equipment (**"TWCi Servers"**). If necessary, TWCi will assign to Supplier the necessary permissions and/or passwords which will allow limited access to the portion of the TWCi Servers on which the Information shall be transmitted to the extent necessary for Supplier to administer the process for delivering the Information pursuant to this Agreement. Supplier will follow the transmission procedures specified in **Attachment A,** as the same may be reasonably modified by TWCi from time to time upon prior notice to Supplier. TWCi reserves the right to override or halt the delivery of Information it deems necessary. Supplier shall comply with any other security measures or procedures specified by TWCi from time to time, and shall be responsible for any use of passwords assigned pursuant hereto, including, without limitation, any use by its employees, agents or

A-1

contractors. Supplier shall maintain appropriate back-ups of the Information, in a manner reasonably satisfactory to TWCi, to protect the Information in the event the transmission of Information fails or is corrupted.

(e) <u>TWCi Link Requirements</u>. TWCi will provide a link to Suppliers' web site on each page where the Information or any part of the Information is displayed , specifying a navigational URL to the pages where Supplier Information resides. The link will appear as: Event information supplied by www.eventcrazy.com and (logo) when it appears in relation to the event listings and the link will appear as: Attraction information supplied by www.eventcrazy.com and (logo) in relation to the attraction listings.

(f) <u>Support.</u> Supplier will provide TWCi with technical assistance and support with respect to the reception and use of the Information as contemplated by this Agreement (the "**Support**"). TWCi will notify Supplier, by phone or email, of any missing, excessive, incorrect, or incomplete data promptly after discovery, with the timing of such data feeds (specified on **Attachment A**). Supplier shall respond to calls or email received from TWCi promptly, but never later than 24 hours following said notification and Supplier shall use its best efforts to resolve any technical issues experienced by TWCi in such time and manner as is reasonable in light of the nature of the problem and its impact on TWCi's business operations and its use of the Information. All Support shall be provided by duly qualified and technically proficient personnel. Failure by TWCi to notify Supplier of any missing, excessive, incorrect, or incomplete data shall not relieve Supplier of its obligation to provide the data in accordance with the terms and conditions of this Agreement or constitute acceptance of the data.

(g) <u>Failure of Supplier</u>. The Parties acknowledge and agree that timely, continuous and uninterrupted delivery and transmission of the Information is critical to TWCi's operations, and that disruptions may result in reduced credibility and loss of revenues for TWCi. Accordingly, if Supplier fails to transmit complete, timely, and accurate Information on the Schedule required hereunder more than once during any one   month period (a "**Failure**") supplier shall be in breach of this agreement and, notwithstanding the provisions of **10(b)**, TWCi may terminate this Agreement by written notice to Supplier.  Supplier will in any event investigate any Failure not caused by TWCi and within 10 days thereof will provide TWCi with a detailed written report of the cause of the Failure, how it was remedied, and the steps taken (or to be taken) to prevent a reoccurrence of the Failure.

(h) <u>Supplier Trademark Usage</u>. TWCi agrees that it will comply with Supplier's written guidelines with respect to the use of Supplier's trademarks, tradenames, service marks, or logos owned, controlled or licensed by Supplier ("**Supplier Marks**"). TWCi acknowledges and agrees that:  (i) it shall not use the Supplier Marks in a manner likely to diminish the Supplier Marks' commercial value; (ii) it shall not knowingly permit any third party to use the Supplier Marks unless authorized to do so in writing by Supplier; (iii) it shall not knowingly use or permit the use of any mark, name, or image likely to cause confusion with the Supplier Marks; (iv) all goodwill associated with TWCi's use of the Supplier Marks shall inure to Supplier; (v) the Supplier Marks are and shall remain the sole property of Supplier; and (vi) nothing in this Agreement shall confer in TWCi any right of ownership in the Supplier Marks, and TWCi shall not make any representation to that effect, or use the Supplier Marks in a manner that suggests that such rights are conferred.

(i) <u>TWCi Trademark Usage</u>. Supplier may, with the written consent of TWCi, indicate that TWCi is a customer, client or licensee of Supplier in its marketing materials and may include the approved trademarks or service marks of TWCi on such materials. Supplier agrees that it will comply with TWCi's written guidelines with respect to the use of TWCi's trademarks, tradenames, service marks, or logos owned, controlled or licensed by TWCi ("**TWCi Marks**"). Supplier acknowledges and agrees that:  (i) it shall not use the TWCi Marks in a manner likely to diminish the TWCi Marks' commercial value; (ii) it shall not knowingly permit any third party to use the TWCi Marks unless authorized to do so in writing by TWCi; (iii) it shall not knowingly use or permit the use of any mark, name, or image likely to cause confusion with the TWCi Marks; (iv) all goodwill associated with Supplier's use of the TWCi Marks shall inure to TWCi; (v) the TWCi Marks are and shall remain the sole property of TWCi; and (vi) nothing in this Agreement shall confer in Supplier any right of ownership in the TWCi Marks, and Supplier shall not make any representation to that effect, or use the TWCi Marks in a manner that suggests that such rights are conferred.

-2-

2.     **Representatives.**

(a)     <u>Principal Point of Contact</u>. Each party will appoint an individual within its organization who will serve as its principal point of contact in connection with the business arrangements under this Agreement, and who shall have overall responsibility for managing and coordinating the performance of such party's obligations under this Agreement.

The principal point of contact for TWCi shall initially be:

> Todd Richards, Editorial Director
> The Weather Channel Interactive, Inc.
> 300 Interstate North Parkway
> Atlanta, GA  30339
> Phone:  770-226-2621
> Email: trichards@weather.com

The principal point of contact for Supplier shall initially be:

> Maria King, President
> Events Media Network, Inc.
> 10 Lexington Court
> Shamong, NJ 08055
> Phone: 609-953-9544
> Email: mking@eventcrazy.com

**(b)**     <u>Technical Representative</u>. **Each party will also appoint an individual within its organization who will be the technical representative in connection with this Agreement.  The technical contact at TWCi will be:**

> The Weather Channel Interactive, Inc.
> 300 Interstate North Parkway
> Atlanta, GA  30339
> Attn: Dan Agronow
> Phone:  770-226-2750
> Email:  dagronow@weather.com

> and the initial technical representative of Supplier will be:

> Bradley King
> Phone: 609-953-9544
> Email: brad@eventcrazy.com

(c)     <u>Change of Representatives</u>.  Either Party may change its principal point of contact or technical representative by giving the other party fifteen (15) days advance written notice of such change.

**Distribution.**  Supplier grants TWCi and its affiliates (now existing or hereafter organized or acquired), a non-exclusive, worldwide, non-transferable right and license to use, exploit, copy, reproduce, publish, transmit, exhibit, broadcast, advertise, publicly perform and display, modify, edit, reformat, synchronize, combine and create abstracts and derivative works of the Information and any portion thereof, in any form or format, in any manner whatsoever throughout the world by any and all means, platforms, technologies, devices or media now known or hereafter developed, whether owned or operated by TWCi, its affiliates, or any third party or parties, including, without limitation, on or as part of a network of websites, on or as part of any electronic "on-line" service or other computer network (including, without limitation, on the Internet, on proprietary networks, or on computer "web" pages), through direct delivery via electronic mail services or "push" technologies, through personal computers,

voice delivery and/or wireless devices, and/or through cable systems, satellite networks or broadcast television stations. Without limiting the foregoing, TWCi and its affiliates in their respective sole discretion may (a) broadcast or use the same on a live and/or delayed basis, in the form received or otherwise, as often as TWCi shall determine, (b) make cuts, insertions or eliminations from all or any part of the Information, (c) incorporate commercial and non-commercial messages in any of the Information and (d) provide for third party sponsorship of the Information. TWCi shall have sole, full and complete editorial control over the implementation and placement of the Information on its web site or other relevant media. Nothing contained herein may be construed to give TWCi the right without further written consent of Supplier to use the Information or any part of it and incorporate it into other programs for uses other than event and attractions listings. To the extent any such use has been made of the Information under any Agreement between the parties, Supplier consents to the continued use of such information for such purpose only and only as long as this Agreement remains in full force and effect.

4.      **Proprietary Rights.**  TWCi acknowledges and agrees that the Information, and all right, title and interest therein, is and shall remain the exclusive property of Supplier.  Supplier shall have the right to obtain and to hold in its own name copyrights, registrations or such other protection as may be appropriate to protect the Information. Supplier shall be responsible for obtaining any permissions necessary to use and display the Information and any other material provided by Supplier for use by TWCi in accordance with this Agreement.  TWCi shall be responsible for obtaining any permissions necessary to place all other content, information and materials on TWCi's web sites and other relevant media.  Supplier acknowledges and agrees that all information and data collected, used, displayed or transmitted by TWCi on its web sites or other media independent of the Information supplied by Supplier under this Agreement, and all right, title and interest therein, is and shall be the exclusive property of TWCi.  The incorporation of the Information into a derivative work by TWCi shall accord no right to TWCi to use the Information, or the derivative work if that is dependent on the Information, subsequent to the termination of this Agreement, and subject to the provisions of Paragraph 10(d).

5.      **Representations and Warranties of Supplier.**  Supplier hereby represents and warrants that:  (i) Supplier owns all right, title and interest in and to the Information; (ii) Supplier has the power and authority to enter into this Agreement and to perform its obligations hereunder and, upon execution and delivery hereof, this Agreement shall constitute the valid and binding obligation of Supplier enforceable in accordance with its terms; (iii) the Information will not violate any laws, regulations or ordinances, or the right of any third party and will not give rise to any claim of such violation, including, without limitation, claims of liable, slander, defamation, copyright infringement, infringement of moral rights, trademark infringement, false designation of origin, disparagement, violation of privacy, publicity, identity or other proprietary rights, violation of patent or shop rights, piracy or plagiarism; and (iv) to the extent that Supplier is required to obtain rights, licenses, permissions, clearances, approvals, consents and/or attribution information necessary for TWCi to utilize the Information in accordance with this Agreement, Supplier will do so accurately and completely, and the Information shall incorporate the necessary credit and/or attribution information.

6.      **Confidentiality.**  For purposes of this Agreement, the term **"Confidential Information"** shall mean all technical, business, and other information of either Party or such Party's affiliates disclosed to or obtained by the other Party, whether prior to, on or after the date of this Agreement, that derives economic value, actual or potential, from not being generally known to others, including, without limitation, any technical or non-technical data, designs, methods, techniques, drawings, processes, products, inventions, improvements, methods or plans of operation, research and development, business plans and financial information of such Party.  Confidential Information also includes the terms and conditions of this Agreement.  Each Party agrees that it will not use, except as may be required to perform under this Agreement, and will not disclose or give to others, any of the other Party's Confidential Information, except as contemplated under this Agreement.  Without limiting the generality of the foregoing, each Party will (a) restrict the disclosure of the Confidential Information to those of its employees who require such information for purposes of performing under this Agreement, (b) inform all of such employees of the obligations under this section, (c) prevent use or disclosure by its employees of the Confidential Information, except as provided herein, and (d) promptly inform the other Party of any use or disclosure of the Confidential Information, whether intentional or not, which violates the provisions of this section.  The restrictions contained in this section shall survive any expiration or

-4-

termination of this Agreement, but shall not apply to any information that does not constitute a trade secret under applicable law three years after the termination or expiration of this Agreement.

7.    **Indemnification.** Supplier shall defend, indemnify and hold harmless TWCi, its affiliates, their respective successors and assigns, and their respective employees, agents and contractors from and against (a) any claim or suit arising out of any alleged breach of the foregoing representations and warranties, (b) any use or reliance on any of the Information, (c) any other breach of this Agreement by Supplier, and (d) all liabilities, damages, losses, costs and/or expenses (including reasonable attorneys' fees) with respect thereto. TWCi shall have the right to participate in any such claim or suit, and shall have the right to approve any settlement thereof that could have an adverse effect on TWCi.

8.    **Limitation of Liability.** EXCEPT WITH RESPECT TO LIABILITY ARISING FROM A PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, NEITHER PARTY HERETO SHALL BE LIABLE TO THE OTHER FOR DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY FOR SUCH DAMAGES) SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS.

9.    **Payment.** TWCi will pay Supplier according to the terms and amounts set forth on **Attachment B** (the "**Content Fee**").

10.   **Term and Termination.**

(a)    Unless earlier terminated as provided in this Agreement, the initial term of this Agreement shall commence on the date first above written and shall continue for a period of thirty (30) months. Thereafter, this Agreement shall be automatically renewed for successive thirty (30) month periods unless either party notifies the other party of its intention not to renew at least thirty (30) days prior to the expiration of the initial or the then current renewal term.

(b)    Either Party may terminate this Agreement by written notice to the other Party upon the occurrence of any of the following events: (i) the other Party materially breaches this Agreement and such breach, if capable of cure, remains uncured for 30 days following written notice by the terminating Party; or (ii) a petition for relief under any bankruptcy law is filed by or against the other Party, or the other Party makes an assignment for the benefit of creditors, or a receiver is appointed for all or substantially all of the other Party's assets. In addition TWCi may terminate this Agreement as provided in Section 1(g) above.

(c)    TWCi may terminate this Agreement immediately upon written notice to Supplier if (i) in the reasonable opinion of TWCi, the continued performance of this Agreement or any part thereof might subject TWCi or its affiliates to unfavorable regulatory action, civil action, violate any law, infringe upon the rights of third parties, or subject TWCi or its affiliates to liability for any reason, or if TWCi determines that any Information provided by Supplier is reasonably objectionable on the grounds that such content may injure the reputation of TWCi or its affiliates due to its socially inappropriate nature and such content cannot be reasonably altered in a prompt fashion prior to display on its website or other media to be unobjectionable upon written notice thereof to Supplier.

(d)    Upon any termination or expiration of this Agreement, Supplier agrees to return to TWCi all documents and materials supplied by TWCi or containing Confidential Information, including all copies of the foregoing, in Supplier's possession, as well as any TWCi equipment in the possession of Supplier. In addition, upon any termination or expiration of this Agreement, Supplier shall not access, or attempt to access, the TWCi Servers or any other systems of TWCi. Except as otherwise specifically provided herein, within five (5) days after termination of this Agreement, TWCi agrees to cease all use of the Information and erase all Information from TWCi computer systems; including such Information as is incorporated in any derivative works, and to assume responsibility for compliance with this provision by any of TWCi's affiliates who have been engaged in any use of the Information pursuant to paragraph 3 above. In addition, Supplier shall immediately cease all use of the TWCi Marks, within thirty (30) days after termination of this Agreement, and shall no longer indicate that TWCi or any of its affiliates is a client, customer or licensee of Supplier.

-5-

11.     **Miscellaneous.**

(a)     **Dispute Resolution.**  Any controversy, claim or dispute between the parties arising out of or relating to the Information, this Agreement, any licenses provided hereunder or the breach, validity or enforceability of any provision hereof (collectively, a "**Dispute**") shall be settled in final and binding arbitration conducted in accordance with the then-current rules for Non-Administered Arbitration of Business Disputes of the Center for Public Resources (the "**Rules**") by a single arbitrator selected by the parties, or if the parties are unable to select an arbitrator within thirty (30) days after notice from either party, the arbitrator shall be selected in accordance with the Rules.

Arbitration hereunder shall be held in Atlanta, Georgia or such other place as the Parties may agree.

Judgment upon the award rendered in any arbitration may be entered in any court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the award and enforcement thereof, as the law of such jurisdiction may require or allow.  The parties agree to facilitate the arbitration by:  (i) making available to one another and to the arbitrator for examination, inspection and extraction all documents, books, records and personnel under their control if determined by the arbitrator to be relevant to the dispute; (ii) conducting arbitration hearings to the greatest extent possible on successive days; and (iii) observing strictly the time periods established by the Rules or by the arbitrator for submission of evidence or briefs.

None of the provisions of this **Section 11(a)** shall prejudice the right of either Party to any Dispute to apply to any court of appropriate jurisdiction for temporary or permanent injunctive or other equitable relief.

(b)     **Assignment.**  The Parties acknowledge that this Agreement has been entered into because of, among other things, the special skills of Supplier, and agree that this Agreement may not be assigned or transferred by Supplier, in whole or in part.  Supplier and TWCi acknowledge that this Agreement and the rights provided for herein shall inure only to the benefit of TWCi, its transferees, successors and assigns, and Supplier and its permitted successors and assigns, and that this Agreement does not confer, and is not intended to confer, any rights upon any person not a party to this Agreement.

(c)     **Notice.**  Unless otherwise specified herein, all notices and other communications to a Party shall be in writing and shall be given to such Party at its address or facsimile number set forth on the signature page, or such other address or facsimile number as such Party may hereafter specify by notice to the other Party.  Notices shall be deemed to have been made upon delivery in person, if delivered by facsimile upon confirmation of receipt by the recipient, or upon the expiration of five days after the date of posting if mailed by certified mail, postage prepaid, to the address specified below.

(d)     **Independent Contractors.**  The Parties acknowledge that the relationship of TWCi and Supplier is that of independent contractors and that nothing contained in this Agreement shall be construed to place TWCi and Supplier in the relationship of principal and agent, master and servant, partners or joint ventures.  Neither Party shall have, expressly or by implication, or represent itself as having any authority to make contracts or enter into any agreement in the name of the other Party, or to obligate or bind the other Party in any manner whatsoever.

(e)     **Amendment; Waiver.**  No amendment of any provision of this Agreement shall be effective unless set forth in writing signed by a representative of each Party, and then only to the extent specifically set forth therein.  No course of dealing on the part of either Party, or any failure or delay by either Party with respect to exercising any of its rights, powers or privileges under this Agreement or under applicable law shall operate as a waiver thereof.  No waiver by any party of any condition or the breach of any provision of this Agreement in any one or more instances shall be deemed a further or continuing waiver of any such condition or provision.

(f)     **Legal Compliance.**  Supplier agrees that it will not at any time take any action which violates, and shall at all times comply with, any and all applicable federal, state and local laws, rules and regulations.

-6-

(g)     **Cumulative Nature of Rights.**  Supplier acknowledges and agrees that TWCi's various rights and remedies in this Agreement are cumulative, severable and nonexclusive of one another and of any other remedies at law or in equity, and that Supplier's several undertakings and agreements contained in this Agreement are covenants independent of one another and of any other provision of this Agreement.

(h)     **Survival.**  The provisions contained in Sections 3, 4, 5, 6, 7, 8 and 9(c) shall survive the expiration or termination of this Agreement for any reason.

(i)     **Choice of Law.**  This Agreement shall be governed by the laws of the State of Georgia, without regard to its conflict of law rules.

(j)     **Entire Agreement.**  This Agreement embodies the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings between the Parties relating to the subject matter hereof.  No representation, promise or inducement has been made by the Parties which is not embodied in this Agreement.

(k)     **Severability.**  If any provision of this Agreement, or the application thereof to any person or circumstance, is held invalid, such invalidity shall not affect any other provision which can be given effect without the invalid provision or application, and to this end the provisions hereof shall be severable.

(l)     **Force Majeure.**  Neither Party shall be deemed in default of this Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed, restricted or prevented by reason of any act of God, fire, natural disaster, act of government, strikes or labor disputes, inability to provide raw materials, power or supplies, or any other act or condition beyond the reasonable control of the Party, provided that such Party gives the other Party written notice thereof promptly and uses its best efforts to cure the delay.  In the event that any act of force majeure prevents either Party from carrying out its obligations under this Agreement for a period of more than ten (10) days, the other Party may terminate this Agreement without liability upon ten (10) days written notice.

*IN WITNESS WHEREOF*, the Parties have caused this Agreement to be executed by their duly authorized agents as of the date first above written.

Address:                                    **THE WEATHER CHANNEL INTERACTIVE, INC.**

The Weather Channel Interactive, Inc.
300 Interstate North Parkway                By: _____
Atlanta, Georgia 30339
Attn:  Vice President, Product Development   Title: _____
Facsimile: _____

With a copy to:

The Weather Channel Interactive, Inc.
300 Interstate North Parkway
Atlanta, Georgia 30339
Attn:   Executive Vice President, Business
        Affairs and General Counsel
Facsimile: _____

Address:

_____            _____

-7-

_____
_____          By: _____

Attn:_____          Title: _____
Facsimile:_____

-8-

**Attachment A**
**Detailed Content and Delivery Information**

**Detailed Description of Information:**

Supplier shall provide detailed schedules and related information for various local and national events. The data represents a rolling twelve month schedule of events in North America, containing separate fields of information such as event name, description, location (venue), etc. (See "Data Fields to be Provided").

**Schedule of Delivery:**

Supplier shall provide the data feed on a daily basis, year round, at a time mutually agreed upon by both parties that shall be no later than 12:00 A.M. Eastern Standard Time (or Eastern Daylight Time when applicable).

**Method of Data Delivery:**

The Supplier shall deliver the feed via File Transfer Protocol (FTP) to TWCi equipment (servers) as outlined in Transmission Procedures.

**Form and Format of Delivery:**

The Supplier shall deliver the feed in the form of a pipe delimited, text file. The first transmission of the feed will contain all current event data from the day of delivery forward. All subsequent files will be a delta of each preceding file, displaying only the changes, additions, and/or updates that need to be made to assure that the residing file, on TWCi servers, houses the most current event information from the current day through no less than 364 days in the future (i.e. a rolling year).

**Data Fields to be Provided for Each Event**

All data fields that are gathered about each event, which includes, but is not limited to, the following:

Event_no, Event_name, *Location, *Address1, *Address2, City, State, Zip, Ethnics, Category, *Attendance, *Description, Open_date, Close_date, Area1, Exchange1, Number1, *Fax_area1, *Fax_exchange1, *Fax_number1, *Area2, *Exchange2, *Number2, * Admission_info, *Hours, Country, DMA, Home_Team, Away_Team

**Data Fields to be Provided for Each Attraction**

 *Location, *Address1, *Address2, City, State, Zip, *Area,* Exchange, *Number, *Description, * Admission_info,*Hours, *Category,*website

(fields marks with "*" are present if available, as often as possible, and when applicable on an event by event basis)

**Transmission Procedures:**

Transfer via FTP to TWCi servers according to the schedule noted above. **in the amount of $7000 per month for the first 12 months of the term of the Agreement**

ATLLIB01 1211550.3
DMEAST #9475223 v4

**Attachment B**
**Payment Procedures/Fees**

Subject to the terms and conditions of this Agreement, TWCi agrees to pay Supplier a license fee (the "Content License Fee") in the amount of $7000 per month for the first 12 months of the term of the Agreement, in the amount of $7500 per month for the remaining 18 months of the term of the Agreement, upon receipt of invoice for each installment. TWCi shall pay Supplier within 30 days of receipt of each invoice.

May 1, 2008 to April 30, 2009-------------$7000.00 per month
May 1, 2009 to October 31, 2009---------$7500.00 per month

D-1

# EXHIBIT "B"

## AMENDMENT TO CONTENT LICENSE AGREEMENT

This Amendment ("Amendment") to the Content License Agreement dated May 1, 2008 (the "Agreement") is made as of October 8, 2010 (the "Effective Date") between **The Weather Channel Interactive, Inc. ("TWCi")** and **Events Media Network, Inc. ("Supplier").**

WHEREAS, the parties desire to amend the Agreement, on the terms and conditions set forth below.

WHEREAS, capitalized terms not otherwise defined in this Amendment shall have the respective meanings given such terms in the Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby amend the Agreement in accordance with the following terms and conditions:

1. The term of the Agreement as set forth in Section 10 of the Agreement, is hereby <u>extended</u> until May 1, 2011. The Agreement shall automatically renew for successive 6 month periods unless either party notifies the other party at least 30 days prior to the expiration of the current renewal term.

2. As of the Effective Date, Schedule D to the Agreement is hereby deleted in its entirety and replaced with Schedule D attached to this Amendment. All references in the Agreement to Schedule D shall be deemed to refer to Schedule D as modified by this Amendment.

3. As of the Effective Date, Schedule E attached hereto is hereby added as a <u>new</u> schedule to the Agreement.

Except as modified and expressly amended by this Amendment, all terms, conditions and covenants contained in the Agreement are hereby ratified and shall be and remain in full force and effect.

Any and all notices, requests, orders and other instruments executed and delivered after the execution of this Amendment may refer to the Agreement without making specific reference to this Amendment unless the context otherwise requires.

This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one of the same instrument. A telecopied signature shall be deemed an original signature for this Amendment.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by duly authorized representatives as of the date written above.

THE WEATHER CHANNEL INTERACTIVE, INC.
300 Interstate North Parkway SE
Atlanta, GA 30339

Signature

Print Name
Vice President

Title
10/8/10

Date

EVENTS MEDIA NETWORK, INC.
10 Lexington Court
Shamong, NJ 08055

Signature

Print Name

Title

Date

**Schedule D**
**Payment Procedures / Fees**

Subject to the terms and conditions of this Agreement, TWCi agrees to pay Supplier a license fee (the "Content License Fee") in the amount of $3,500 per month for the term of the Agreement, payable within thirty (30) days following TWCi's receipt of an invoice for each monthly installment.

**Schedule E**
**Other Promotional Link Requirements**

a.   TWCi shall display a static, hypertext link in the footer section of the TWCi Site located at
     www.weather.com

b.   This link will direct users to a web page of Supplier's choosing, but will need to be approved by TWCi,
     approval not to be unreasonably withheld.

c.   This link will be implemented no later than Nov 1, 2010 and will remain in place for the Term of this
     Agreement.



# EXHIBIT "C"

**From:** Ritger, Chris [mailto:CRitger@weather.com]
**Sent:** Monday, August 15, 2011 11:31 AM
**To:** Maria K.
**Subject:** RE: 2nd notification

Maria:

Our legal team has informed me that according to Paragraph 3 (which survived the termination of the agreement) grants TWC the perpetual right to use, transmit, modify and display the Information provided by Events Media. It seems that this does allow us TWC use the data locations in question. Please review and let me know if you wish to discuss further.

Chris

**From:** Maria K. [mailto:mking@eventcrazy.com]
**Sent:** Thursday, July 28, 2011 4:46 PM
**To:** Ritger, Chris
**Subject:** 2nd notification

Hi Chris-

I am holding off the legal team from starting proceedings regarding this issue. It is 3 months past the contract termination and TWCI is still using our data in clear violation of the termination agreement. Please remove the information immediately.

Regards,

Maria

Maria R. King
President, Events Media Network, Inc.
800-282-9909
609-953-9544
mking@eventcrazy.com