NOT FOR PUBLICATION                                            (Doc. No. 71)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                                    :
EVENTS MEDIA NETWORK, INC.,                          :
                                                    :
                  Plaintiff,                         :
                                                    :
         v.                                          :          Civil No. 13-03 (RBK/AMD)
                                                    :
THE WEATHER CHANNEL                                  :              **OPINION**
INTERACTIVE, INC., et al.,                           :
                                                    :
                  Defendants.                        :
_____                 :

**KUGLER**, United States District Judge:

        This matter comes before the Court on the motion of Defendants The Weather Channel

Interactive, Inc., The Weather Channel Interactive, LLC, and The Weather Channel, LLC

(collectively "Defendants" or "TWC") for summary judgment pursuant to Federal Rule of Civil

Procedure 56 (Doc. No. 71).  The subject of this motion is Plaintiff Events Media Network,

Inc.'s ("Plaintiff" or "EMNI") Second Amended Complaint, in which it alleges Defendants

misappropriated EMNI's trade secrets, and that EMNI is entitled to damages for breach of

contract.   For the reasons stated herein, Defendants' Motion for Summary Judgment will be

granted in part and denied in part.

**I.      FACTUAL BACKGROUND**[1]

        This suit arises out of TWC's alleged misuse of data, provided by EMNI to TWC

pursuant to a series of content licensing agreements, during and after the period of the

---

[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff.  See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

agreements. Specifically, EMNI claims that TWC misappropriated trade secrets and breached its contract with EMNI by using certain data, without permission from or proper attribution to EMNI. TWC counters by arguing that the data did not fall within the scope of what constitutes a "trade secret" under Georgia law; the claims for monetary damages in contract are prohibited by the express terms of the content licensing agreements; and EMNI's plea for an injunction in the breach of contract claim is moot.

Plaintiff is a Delaware Corporation, with a business address in Shamong, New Jersey. (Second Amended Complaint ("SAC") ¶ 1.) EMNI collects, reviews, compiles, distributes, maintains, and licenses information in the nature of detailed schedules and related information for various local and national events and attractions, and acts as a data provider of this information to other companies. (Pl.'s Response to Defs.' Statement of Material Facts not in Dispute ("Pl.'s Resp.) ¶ 1.)[2]

Defendants are a Georgia corporation, with a principle place of business in Atlanta, Georgia. (SAC ¶ 3.) TWC provides current meteorological conditions and forecasts, and related maps, news, weather, travel, business, recreational, sports, health, safety, scientific, historical, and other information through various types of electronic media, including its website and wireless devices. (Defs.' SMF ¶ 2.) TWC specifically provides forecasts for cities, zip codes, or

---

[2] The Court notes that the parties apparently agree on very little in this case, even facts as simple as how to describe the nature of Plaintiff's business. The highly vexatious nature of several of Plaintiff's attempts to dispute trivial or irrelevant parts of Defendants' Statement of Material Facts not in Dispute is completely improper, particularly in light of the purposes of the L. Civ. R. 56.1 statements submitted by each party. (See, e.g., Pl.'s Resp. ¶¶ 1, 6-8, 13, 20, 24, 30, 31, 34, 35, 37-40, 43; see also Middleton v. City of Ocean City, No. 12-605, 2014 WL 2931046, at *1 n.1 (D.N.J. June 30, 2014) (noting that "the purpose of the 56.1 statement is to narrow the issues before the District Court, to assist in identifying whether material facts are, or are not, in dispute in a summary judgment motion.") (internal citations omitted).) Moreover, in several places both Plaintiff and Defendants inappropriately use their 56.1 statements to advance legal arguments, or even deny facts that are plainly supported by the record. See De la Torre v. Lockheed Martin Corp., No. 13-127, 2014 WL 2931268, at *1 n.4 (D.N.J. June 30, 2014).

To the extent that the parties agree on a particular fact the Court will cite Defendants' Statement of Material Facts not in Dispute ("Defs.' SMF"). Otherwise, the Court will rely on the record to fill in most of the details of this case.

specific locations by mapping these locations to the nearest forecast points.  (Id. ¶ 3.)  Within its

database, TWC has hundreds of thousands of locations.  (Ex. A to Forte Decl., Patrick Rouse

Deposition Testimony ("Rouse Dep.") at 21:24-22:4; 179:12-16.)  The present litigation relates

to all of EMNI's data that was allegedly misappropriated by TWC, (see SAC ¶ 40), which TWC

approximates was about 13,000 entries in its database.  (See Rouse Dep. at 40:15-19; 179:3-16.)

Over time, EMNI has adopted a series of business models for the purpose of monetizing

its database of information.  (Defs.' SMF ¶ 33.)  EMNI claims that by virtue of its own efforts

and expenditures, it has achieved a competitive advantage over providers of similar services by

developing and preserving the confidentiality of certain proprietary information, namely, its

database of Event Data and Attraction Data (the "Information").  (King Decl. ¶ 7.)

Originally, EMNI published a yearly publication entitled "Annual Special Events

Directory and Yellow Pages" (the "Directory"), and a bi-monthly magazine entitled "Events

Business News Magazine."  (Id.)  According to EMNI, the Directory was a trade publication that

derived income in the events industry, and included a rolling schedule of events that took place

over specific periods of time, in specific locales, and under well-defined search criteria.  (King

Decl. ¶¶ 11, 13.)  The event details included in the Directory contained event names, dates, the

city and state, a phone number for contact purposes, and possibly a brief description.  (Id. ¶ 12.)

However, the Directory did not contain full location addresses, GPS coordinates, or zip codes.

(Id.)  Approximately 2,500 copies of the Directory were published each year, and it was

advertised within the events industry.  (Id. ¶ 15.)  Defendants note that the Directory was similar

to a telephone book, with over 800 pages of information.  (Ex. H to Forte Decl., Maria King

Deposition Testimony ("King Dep.") at 214:22-215:9.)  They also claim it was the recognition of

EMNI and its Directory by several entities in the events industry that initially caused TWC to

3

contact EMNI about its needs for a data provider.  (Ex. T to Forte Decl., Larry Hanson

Deposition Testimony ("Hanson Dep.") at 26:9-27:6.)

 In 2001 EMNI launched a website, transitioning to providing its customer base with the

information contained in the Directory in a more manageable, digital format.  (King Decl. ¶¶ 14,

16-17.)  Until 2005 EMNI's website required a subscription and a password, and was limited to

current subscribers to EMNI's Directory.  (Id. ¶ 16.)  The general public has access to EMNI's

website, but Plaintiff currently claims no one can access all of EMNI's information on its

website.  (King Decl. ¶ 18.)  At this time EMNI limits certain searches to 99 results, limits

searches to a 50-mile radius of an entered address, and monitors searches to prevent individual

users or IP addresses from running too many searches.  (Id.)

 The initial basis for EMNI's online database was, in part, the data from the Directory.

(Id. ¶ 17.)  However, the online database was also optimized to make EMNI's Information usable

in a variety of formats and circumstances, and EMNI built custom software to enter, house,

disseminate, license, manage, and publish its data.  (Id.)  EMNI also substantially increased the

amount of data researched, gathered, compiled, and made available to its licensees.  (Id.)  Given

the valuable nature of this database of the Information, EMNI entered into several licensing deals

with third parties, including Hilton, Google, Microsoft, and TWC.  (King Decl. ¶ 20.)

 Beginning on September 1, 2002, EMNI and TWC entered into the first of a series of

Content Licensing Agreements (the "2002 Agreement").  (Ex. B to Forte Decl., 2002

Agreement.)  The Content License Agreement was amended and/or renewed in January 2003

(the "2003 Amendment"), (Ex. C to Forte Decl., 2003 Amendment), March 2004 (the "2004

Agreement"), (Ex. D to Forte Decl., 2004 Agreement), March 2006 (the "2006 Agreement"),

(Ex. E to Forte Decl., 2006 Agreement), May 2008 (the "2008 Agreement"), (Ex. F to Forte

Decl., 2008 Agreement), and October 2010 (the "2010 Amendment") (collectively the "Agreements").  (Ex. G to Forte Decl., 2010 Amendment.)

The Agreements provided that

> [EMNI] grants [TWC] and its affiliates … a … right and license to use, exploit, copy, reproduce, publish, transmit, exhibit, broadcast, advertise, publicly perform and display, modify, edit reformat, synchronize, combine and create abstracts and derivative works of the Information and any portion thereof, in any form or format, in any manner whatsoever throughout the world by any and all means, platforms, technologies, devices or media now known of hereafter developed, whether owned or operated by [TWC], its affiliates, or any third party or parties … [TWC] shall have sole, full and complete editorial control over the implementation and placement of the Information on its website and other relevant media.

(E.g., 2004 Agreement ¶ 3; 2006 Agreement ¶ 3; see also Defs.' SMF ¶ 14.)  Beginning in 2006 the Agreements also contained a clause in Paragraph 3 which provided that

> [n]othing contained herein may be construed to give [TWC] the right without further written consent of [EMNI] to take the Information or any part of it and incorporate it into other programs for uses other than event and attractions listings.  To the extent any such use has been made of the Information under any Agreement between the parties, [EMNI] consents to the continued use of such Information for such purpose only and only as long as this Agreement remains in full force and effect.

(2006 Agreement ¶ 3; 2008 Agreement ¶ 3.)

The Agreements also contained a Proprietary Rights provision, stating, "[TWC] acknowledges and agrees that the Information, and all right, title and interest therein is and shall remain the exclusive property of [EMNI]," (e.g., 2004 Agreement ¶ 4; 2006 Agreement ¶ 4), as well as a Confidentiality provision, which stated,

> [f]or the purposes of this Agreement, the term "Confidential Information" shall mean all technical, business, and other information of either Party or such Party's affiliates disclosed to or obtained by the other Party, whether prior to, on or after the data of this Agreement, that derives economic value, actual or potential,

> from not being generally known to others,, including, without limitation, any technical or non-technical data, designs, methods, techniques, drawings, processes, products, inventions, improvements, methods or plans of operation, research and development, business plans and financial information of such Party. … Each Party agrees that it will not use, except as may be required to perform under this Agreement, and will not disclose or give to others, any of the other Party's Confidential Information, except as contemplated under this Agreement. … The restrictions contained in this section shall survive any expiration or termination of this Agreement, but shall not apply to any information that does not constitute a trade secret under applicable law three years after the termination or expiration of this Agreement.

(E.g., 2004 Agreement ¶ 6; 2006 Agreement ¶ 6.)

Finally, the Agreements contained a Limitation of Liability provision that precluded recovery by either party of direct, indirect, incidental, consequential, special, or exemplary damages in the event of a breach of the Agreements.  (Defs. SMF ¶ 19.)  EMNI acknowledges that it negotiated, read, and understood the Agreements entered into with TWC, and had included similar Limitation of Liability provisions in agreements it had entered into with other licensees. (Defs.' SMF ¶¶ 21-22.)

Under the terms of each of the Agreements, EMNI provided TWC with Event Data, which included, among other things, location, address, city, state, and zip code data fields.  (See 2002 Agreement, 2004 Agreement, 2006 Agreement, and 2008 Agreement, Attachment A.) After 2006, EMNI also provided TWC with Attraction Data pursuant to the terms of the 2006 and 2008 Agreements, which similarly included location, address, city, state, and zip code data fields.  (See 2006 Agreement and 2008 Agreement, Attachment A.)[3]

---

[3] Plaintiff uses the term "Information" to refer interchangeably to the specific types of data licensed under the Agreements as well as the totality of the data contained in its own database.  The record indicates EMNI did not license all of its Information in the 2002 Agreement, 2003 Amendment, or 2004 Agreement, so far as it encompasses both Event Data and Attraction Data.  However, the Court will use Plaintiff's term "Information" throughout this Opinion to refer to the combined Event Data and Attraction Data, noting that prior to the 2006 Agreement EMNI was only providing TWC with Event Data pursuant to the Content Licensing Agreements.

The Event Data was provided to TWC via a daily feed, which was transmitted directly to TWC's server.  (Defs.' SMF ¶¶ 8-10.)[4]  In October 2004 EMNI notified its clients that new geocoding information was available for its Event Data, and TWC requested this information.  (See Exs. D-F to King Decl., 2004 Geocoded Information Emails.)[5]  According to Plaintiff, EMNI originally sent a file containing 4,088 up-to-date Coordinate Data records in October 2004, resent a file with 4,005 up-to-date records in November 2004, and finally sent a file with 32,068 Coordinate Data entries at TWC's request that same November, in order that TWC could update all of its existing Location Data.  (See id.; King Decl. ¶¶ 31-33.)  The emails containing the Coordinate Data were not specifically designated as confidential, nor where they encrypted or password protected.  (See King Dep. at 86:6-9; Exs. D-F to King Decl., 2004 Geocoded Information Emails.)  From 2006 to 2011 EMNI claims they also provided Attraction Data to TWC via email attachments rather than as part of the daily feed.  (King Decl. ¶ 43 (citing Ex. I to King Decl., Attraction Data Emails).)  The Attraction Data was only provided upon request, and EMNI claims this occurred a minimum of five times.  (Id.)

During the term of the Agreements, each party questioned whether it was worthwhile to continue the Agreements.  (Defs.' SMF ¶ 23.)  Over the course of their business relationship, TWC had paid between $1,500 per month and $7,500 per month for EMNI's Information.  (See 2002 Agreement, 2004 Agreement, and 2006 Agreement, Attachment D; 2008 Agreement,

---

[4] TWC refers to the location information, i.e., location, address, city, state, and zip code data fields, contained in the Event Data and Attraction Data as "Location Data."  (See Defs.' SMF ¶¶ 7-8.)  The Court notes that the record does not indicate EMNI ever licensed a separate category of data called "Location Data" under the Agreements.  However, for purposes of clarity in this Opinion, the Court will use the term "Location Data" to refer to a subset of the Event Data and Attraction Data including the location and address data fields mentioned above.

[5] Hereinafter the Court will refer to geocoded data, i.e., data with a location I.D., address, and latitude and longitude coordinates, as "Coordinate Data."  Coordinate Data differs from Location Data due to the presence of the latitude and longitude coordinates.  It is worth noting again that Coordinate Data was not apparently a specific set or subset of EMNI's Information that was licensed to TWC, but was provided to TWC to supplement its existing Event Data.  (See King Decl. ¶ 31.)

Attachment B; 2010 Amendment.)  At the expiration of the 2008 Agreement, TWC was paying $3,500 per month.  (See id.)  EMNI also claims that the attribution TWC provided for EMNI's Information throughout its website, primarily in the form of hyperlinks to EMNI's own website, was worth at least an estimated $26,000.  (Pl.'s Resp. ¶ 24.)[6]  Because TWC decided not to renew the Agreements, the 2008 Agreement and 2010 Amendment expired by its terms on May 1, 2011.  (Defs.' SMF ¶¶ 25-26.)  The 2008 Agreement contained a provision which provided that "within five (5) days after the termination of [the] Agreement, [TWC] agrees to cease all use of the Information and erase all Information from [TWC's] computer systems; including such Information as is incorporated in any derivative works."  (2008 Agreement ¶ 10(d).)

According to EMNI, it learned that TWC continued to use EMNI's Information after the termination of 2008 Agreement, and TWC had been misappropriating EMNI's data for unanticipated uses since as early as 2002.  (King Decl. ¶ 45.)  With respect to the issue of possession and use of the Information after the expiration of the Agreements, TWC claims that it stopped using the Event Data after the expiration of the Agreements, (see King Dep. at 126:4-10), and deleted all of the remaining Coordinate Data from its database in December 2011.  (See Rouse Dep. at 102:13-16.)  EMNI argues that it visually confirmed TWC was still using its Information after the termination of the agreement, (King Decl. ¶ 46), and EMNI's computer experts opined that the procedures allegedly used by TWC in its deletion efforts were likely insufficient to ensure that all of EMNI's Information had been deleted from TWC's computer systems.  (See Ex. B to Metzger Decl., Digital Elysium Report ("Expert Report").)

---

[6] The Court notes that none of the materials cited by Plaintiff in this paragraph of its Response to Defendants' Statement of Material Facts not in Dispute actually support the valuation of the hyperlink to be $26,000.  The materials only confirm that TWC was required to provide attribution to EMNI when using its Information.  (See 2002 Agreement and 2006 Agreement ¶ 1(e); King Decl. ¶ 38.)  Accordingly, the Court will not consider this number for purposes of resolving the present motion.

Plaintiff also alleges that TWC used the Location Data and Coordinate Data, provided within the Event Data and Attraction Data, for unanticipated uses as early as 2002.  (King Decl. ¶ 54; Ex. AA to Forte Decl., March 3, 2006, Email from Maria King to Larry Hanson ("March 3 Email"); id. January 3, 2012, Emails from Maria King to Larry Hanson ("Jan. 3 Emails"); Ex. N to King Decl., July 2012 Emails from Maria King to Larry Hanson ("July 2012 Emails").)  TWC does not dispute that it used Location Data and Coordinate Data from the Event Data and Attraction Data in an unrelated weather mapping system, but claims such a use was authorized under the terms of the Agreements.  (Defs.' SMF ¶ 49 (citing 2006 Agreement ¶ 3).)  EMNI counters that it never consented to such use of its Information for mapping weather forecast points or building out other products for unrelated purposes without giving credit to EMNI. (King Decl. ¶ 54.)

On March 27, 2012, Plaintiff filed a Complaint in the Court of Common Pleas, Philadelphia County, Pennsylvania.  Defendants filed a timely Notice of Removal on May 1, 2012, removing the matter to the United States District Court for the Eastern District of Pennsylvania (Doc. No. 1).  On November 29, 2012, the case was transferred to this Court pursuant to 28 U.S.C. § 1404(a) (Doc. No. 29).  After the Court denied Defendants' Motion to Dismiss (Doc. No. 48), Plaintiff moved for leave to file an amended complaint (Doc. No. 56), and filed the SAC on December 5, 2013 (Doc. No. 59).

In Plaintiff's SAC it is alleged that Defendants misappropriated EMNI's trade secrets, in violation of the Georgia Trade Secrets Act, prior to and after the termination of the Agreements (Counts I-III), and that Defendants are liable for breach of contract as a result of their conduct both prior to and after the termination of the Agreements (Counts IV-VI).  Plaintiff seeks both injunctive relief (Counts I and V) and monetary damages (Counts II-IV, and VI).

Defendants filed the present Motion for Summary Judgment on July 31, 2014 (Doc. No. 71).  For the reasons set forth below, the Court will grant Defendants' Motion as to Counts I-IV and VI, and deny Defendants' Motion as to Count V.

## II.    LEGAL STANDARD

The Court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).  In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact.  Anderson, 477 U.S. at 248.  Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in its favor.  Id. at 255; Matsushita, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment.  Anderson, 477 U.S. at 256.  The nonmoving party must at least present probative evidence from which the jury might return a verdict in his favor.  Id. at 257.  The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317,

322 (1986).

## III.    DISCUSSION[7]

### A.    Plaintiff's Trade Secrets Claims (Counts I-III)

In Counts I-III Plaintiff alleges that Defendants misappropriated EMNI's trade secret in

violation of Georgia law.  Defendants argue in their present Motion that EMNI's data at issue in

this case was not a trade secret, and that even if the data were considered a trade secret, EMNI's

claims are barred by the five year statute of limitations.  Plaintiff contends that there are still

material facts in dispute concerning whether EMNI's data was a trade secret and whether EMNI

had notice of the alleged misappropriation prior to 2011, which would toll the applicable statute

of limitations.  Because the Court finds that Plaintiff is unable to maintain one of the requisite

elements under the GTSA, it will not address Defendants' statute of limitations argument.

### 1.    Georgia Trade Secrets Act

The Georgia Trade Secrets Act ("GTSA") permits plaintiffs to recover for the

misappropriation of trade secrets in the form of injunctive relief and monetary damages.  See Ga.

Code §§ 10-1-760 et seq.  To obtain relief, Plaintiff must demonstrate that the information at

issue constitutes a "trade secret," and that Defendants misappropriated that trade secret.

Wachovia Ins. Servs., Inc. v. Fallon, 682 S.E. 2d 657, 662 (Ga. Ct. App. 2009).  A "trade secret"

is defined as

> (4) … information, without regard to form, including, but not
> limited to, technical or nontechnical data, a formula, a pattern, a
> compilation, a program, a device, a method, a technique, a
> drawing, a process, financial data, financial plans, product plans, or
> a list of actual or potential customers or suppliers which is not

---

[7] Both parties agree that Georgia law governs these claims, and the Agreements each contained a provision specifying that Georgia law would govern the Agreements.  (See, e.g., Defs.' Br. at 11; SAC ¶ 36; 2008 Agreement ¶ 11(i).)  Accordingly, the Court will apply Georgia law to Plaintiff's claims.

commonly known by or available to the public and which information:

> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 10-1-761(4).[8]  Thus, EMNI must show that the data in question was "(i) information not commonly known by or available to the public, (ii) which derives economic value from not being generally known to or ascertainable by proper means by others who can obtain economic value from the information; and (iii) that was subject to reasonable efforts to maintain its secrecy." EarthCam, 2014 WL 4702200, at *8 (citing Capital Asset Research Corp. v. Finnegan, 160 F.3d 683, 685 (11th Cir. 1998)).  Whether information deserves protection as a trade secret is a question of fact.  Insight Tech., Inc. v. FreightCheck, LLC, 633 S.E.2d 373, 380 (Ga. Ct. App. 2006).

## 2.    Whether the Misappropriated Data was a Trade Secret

According to TWC, Plaintiff's data is not a trade secret because (a) EMNI made insufficient efforts to maintain the secrecy of the data, (b) the data in question derives no economic value from not being generally known, and (c) the data is readily ascertainable by proper means.  EMNI disputes each of these points.  The Court will only address TWC's first point, that EMNI made insufficient efforts to maintain the secrecy of its data, in deciding to grant Defendants' Motion for Summary Judgment on these Counts.

---

[8] Additionally, "[a] defendant 'misappropriates' a trade secret when, among other things, it discloses or uses 'a trade secret of another without express or implied consent' knowing at the time of the disclosure or use that the trade secret was '[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.'" EarthCam, Inc. v. OxBlue Corp., No. 11-2278, 2014 WL 4702200, at *9 (N.D. Ga. Sept. 22, 2014) (quoting § 10-1-761(2)(B)).

Defendants argue that because Plaintiff has released its Information into the public domain in the form of printed publication and over the internet, and because the agreement was not a reasonable effort to maintain the secrecy of EMNI's data, the data is not subject to trade secret protection. The Court notes that this inquiry focuses the actions of Plaintiff, rather than the nature of the information. See Equifax Servs., Inc. v. Examination Mgmt. Servs., Inc., 453 S.E. 2d 488, 493 (Ga. Ct. App. 1994).

Generally, mere disclosure of a trade secret to a person or business with whom a plaintiff has a confidential business relationship does not destroy trade secret protection. Diamond Power Int'l, Inc. v. Davidson, 540 F. Supp. 2d 1322, 1333 (N.D. Ga. 2007) (citing Monumental Props. of Ga., Inc. v. Frontier Disposal, Inc., 282 S.E. 2d 660, 663-64 (Ga. Ct. App. 1981)). This typically involves the sharing of information with confidants who are legally obligated, expressly or implicitly, to maintain the secrecy of the information. Diamond Power, 540 F. Supp. 2d at 1333. However, when information is publicly disclosed, such as through sale or disclosure to customers, it is no longer protected by the GTSA. Id. (citing Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1454 (11th Cir. 1991)). For instance, where a plaintiff distributes to its customers designs, manuals, schematics, or other such information, "even if they are labeled 'proprietary' or 'confidential,'" such a failure to maintain the secrecy of the information precludes GTSA protection. Diamond Power, 540 F. Supp. 2d at 1333 (citing Servicetrends, Inc. v. Siemens Med. Sys., Inc., 870 F. Supp. 1042, 1074 (N.D. Ga. 1994) (holding that distribution to customers of medical device's schematic diagram, repair instructions, manuals, and wiring diagrams, despite being marked "proprietary data" and "confidential," destroyed trade secret protection)). Additionally, merely requiring a party to sign a confidentiality agreement is usually not sufficient, as a matter of law, to maintain the secrecy of certain information. See Diamond

Power, 540 F. Supp. 2d at 1334; Equifax, 453 S.E. 2d at 493; AmeriGas Propane, L.P. v. T-Bo

Propane, 972 F. Supp. 685, 700-01 (S.D. Ga. 1997).[9]

 Even considering the facts most favorably for Plaintiff, the Court finds that it cannot

reasonably be concluded that Plaintiff made sufficient efforts to maintain the secrecy of its data.

Dealing first with the Information as a whole, Plaintiff admits that the Agreements permitted

TWC to "use, exploit, copy, reproduce, publish, transmit, exhibit, broadcast, advertise, publicly

perform and display … [or] create … derivative works of the Information and any portion

thereof, in any form or format, and in any manner whatsoever throughout the world by any and

all means … whether owned or operated by [TWC], its affiliates, or any third party or parties."

(Defs.' SMF ¶ 14.)  Plaintiff also acknowledges that under the purposes of the licensing

agreement, "it was in EMNI's best interest for TWC to use EMNI's Information as much as

possible on TWC's website … [t]he fact that TWC was going to use EMNI's Information all

over weather.com was something that [EMNI] encouraged, subject to the limitations of our

agreements, including but not limited to the attribution provision."  (King Decl. ¶ 53.)  In

exchange for using EMNI's data as broadly as possible, TWC paid EMNI a licensing fee and

provided attribution in the form of a link to EMNI's website every time the Information was

used.  (Id.)  This was intended to make EMNI's deal with TWC financially advantageous, as "it

was in EMNI's best interest that the Event Data be used as many places as possible."  (Id.)  Put

---

[9] Plaintiff's citation to Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284, 1291-92 (11th Cir. 2003) is not to
the contrary.  There the record apparently revealed that Coca-Cola was advised that a certain product design
presented by PKM was confidential and that PKM was pursuing global patent protection for its product, and the
representatives from Coca-Cola acknowledge the confidentiality.  Id. at 1287.  PKM then executed an agreement
with Coca-Cola shortly thereafter, in which Coca-Cola agreed not to disclose any confidential information shared by
PKM during its discussions with Coca-Cola.  Id.  In that case it appears the confidentiality acknowledgment and
agreement applied directly, and immediately, to the trade secret, and the Eleventh Circuit affirmed the district
court's finding on this issue.  Penalty Kick Mgmt. does not, however, address a situation where one party provides
another with access to a great volume of information, outside of confidential discussions, and includes a
confidentiality provision which appears at least ambiguous as to certain information provided, in light of the purpose
and terms of the overall contract.

simply, EMNI entered into an agreement whereby TWC had the right to publish or use EMNI's data broadly, so long as it provided attribution to EMNI, which in turn would hopefully generate business for EMNI.

Plaintiff attempts to rely on the combination of the "Confidentiality" provision, the "Proprietary Rights" provision, and language inserted into the 2006 Agreement precluding TWC from "tak[ing] the Information or any part of it and incorporate[ing] it into other programs for uses other than event and attractions listing," in arguing that the Information was intended to remain confidential.  (See King Decl. ¶ 41; 2006 Agreement ¶ 3.)  It is clear that any information considered "Confidential Information" was meant to be protected, but it is not obvious what "Confidential Information" included, particularly whether it referred to the Event Data or the Attraction Data.  (See id. ¶ 6.)  Though the Agreements all contained a "Confidentiality" provision, there is no evidence that this provision was intended to destroy the previously described purpose of the contract.  See Thomas v. B & I Lending, LLC, 581 S.E. 2d 631, 634 (Ga. Ct. App. 2003) (noting that contracts should be analyzed as a whole, and "each provision is to be given effect and interpreted so as to harmonize with the others.") (internal quotation marks and citations omitted).  Nor does the "Proprietary Rights" provision affect this Court's inquiry, as it only specified that the Information remained the exclusive property of EMNI at all times. (See id. ¶ 4.)  Finally, while the 2006 Agreement did contain a restriction on TWC's right to use the Information, or portions of it, in programs other than event or attraction listings, it is clear that this language also anticipates that such use could be permitted under the terms of the contract, and the following sentence even concedes that "[t]o the extent any such use has been made of the Information … [EMNI] consents to the continued use of such Information for such purpose."  (Id. ¶ 3.)  Such a provision hardly indicates that Plaintiff was concerned that the Event

and Attraction Data, or any portion thereof, remain confidential indefinitely.

Based on the foregoing, the Court cannot reasonably infer that the Information licensed to TWC under the terms of the Agreements was intended to remain confidential, or that EMNI sufficiently attempted to maintain the secrecy of its data.  The record actually indicates that EMNI was not attempting to protect the Information from public disclosure, but increase its dissemination, giving TWC broad discretion over how and where it would use the Information publicly to achieve this end.

Plaintiff seems to contend that the Coordinate Data, as a subset of the Information contained in EMNI's own database, was either also a trade secret by virtue of the effort that EMNI spent compiling it into its database, or misused as an essential part of EMNI's actual trade secret, the Information compiled in its database.  (Pl.'s Opp'n at 9-11.)[10]  Defendants' alleged use of the Coordinate Data is perhaps a more nuanced issue, but upon inspection of the record, the Court still cannot reasonably conclude that EMNI undertook sufficient measures to guard the secrecy of this data.

Plaintiff cites no other confidentiality measures in place to protect the Coordinate Data it transmitted to Defendants.  EMNI admits that when it first provided geocoding information for the Event Data in 2004, it did so via email, and possibly provided more Coordinate Data than

---

[10] The Court notes that Plaintiff apparently wants to have it both ways when referring to what Defendants' allegedly misappropriated.  On the one hand Plaintiff maintains that the "thing" Defendants misappropriated was the Information (i.e., Event Data and Attraction Data), (see Pl.'s Resp. ¶ 5; Pl.'s Opp'n at 7), while on the other hand Plaintiff seems to maintain that it was specifically the Location Data and Coordinate Data that was misused and misappropriated by TWC.  (See Pl.'s Opp'n at 14 ("[The Directory] contained no full location addresses, no GPS coordinates, and no zip codes – in other words, the core of the Information that was wrongfully used and wrongfully retained by TWC.)  Yet, EMNI has seemingly only claimed that it was the Information, in its compiled format, which was the trade secret.  (See SAC ¶ 10; Pl.'s Opp'n at 8; Pl.'s SDF ¶ 5; King Decl. ¶ 7 ("Although none of the individual bits of data gathered together by EMNI is confidential, once gathered together into a compilation from various sources into the format created by EMNI, this constitutes trade secrets").)  While the Court questions whether the misuse of a portion of the alleged trade secret is sufficient under the GTSA, it nonetheless concludes that Plaintiff has failed to maintain the secrecy of its Coordinate Data.

TWC had actually been licensed.  (See King Decl. ¶¶ 31-34.)  Examining those emails, there is no indication that the data came with any additional protections or reminders of confidentiality. (See Exs. D-F to King Decl., 2004 Geocoded Information Emails.)  In fact, it appears that EMNI sent TWC more information than necessary, yet included no warning for TWC that it was not authorized to use certain parts of the transmitted data.  (See Ex. F to King Decl., November 8 Geocoded Information Emails.)  Such an act seriously undermines EMNI's claim that it considered the information both confidential and a trade secret.  See B & F Sys., Inc. v. LeBlanc, No. 07-192, 2011 WL 4103576, at *25 (M.D. Ga. Sept. 14, 2011) (finding customer list was not a trade secret where the list was freely emailed with no password protection or confidentiality notice on the emails, no pages of the customer list were marked confidential, and the only potentially applicable confidentiality provision was located in a separate document, and did not clearly reference the confidentiality of customer lists).

The provision in the 2006 Agreement prohibiting TWC from taking the Information "or any part of it" and incorporating it into other programs for anything other than event and attraction listings, without the consent of EMNI, does appear to specifically address TWC's alleged misuse of the Coordinate Data in this matter.  (See 2006 Agreement ¶ 3.)  However, it is not clear that this provision was intended to guard the secrecy of the data, as the language of the provision suggests that EMNI might consent to such use.  Moreover, in the following sentence, the provision states that EMNI consents to the "continued use of such Information for such purpose … [t]o the extent any such use has been made of the Information under any [prior] Agreement."  (Id.)  If EMNI truly intended to keep its Information, or any sub part of its Information, secret, it does not follow that a pre-existing use of the data outside of events and

17

attractions listings would be permissible.[11]  Plaintiff's position is even more problematic

---

[11] There is some question as to whether EMNI was actually aware of TWC's use of Location Data (i.e., full addresses including zip codes) and Coordinate data prior to the 2006 Agreement.  Though the parties raise the issue in the context of Defendants' statute of limitations argument, the Court notes that TWC's position appears to be supported by record, substantiating this Court's finding that EMNI did not sufficiently attempt to protect the secrecy of this data.

There is evidence suggesting that TWC informed EMNI how it intended to use the Coordinate Data for other purposes prior to the execution of the 2006 Agreement.  (See Hanson Dep. at 45:8-46:9 (noting that EMNI was aware that TWC intended to use its data for all profitable purposes); 47:2-48:8 (describing emails in which Hanson told King TWC may have continued to use EMNI's Coordinate Data for other uses after 2004).  This includes emails from King suggesting that she was aware of TWC's use of the Coordinate Data in other products as early as 2004 or 2006:

> Also, did you know that [TWC] [was] taking our location information and mapping a new weather reporting service to them and then using that in some new system they have been working on for about a year and a half? … I was very upset when I heard that because they really had no right to do that without our permission. … [T]hat location data with the geo-coding and the size and scope along with the value of the type of location we have … would have been very expensive for them to buy or gather on their own. …
>
> Hopefully we can resolve this as we move forward in the new contract.

(March 3 Email.)

> [EMNI] is being screwed by [TWC] over the data that they have been using all these years that was removed and put in other places throughout weather without our permission. … After you [Hanson] gave us a heads up, [I] [had] them add the clause to the contract that they could not use it if they contract with us.
>
> [W]hen you [Hanson] just left [TWC] you told me to watch out because they took all of our locations and they are using them in another product that has nothing to do with events.  In other words they had breached the contract by doing so.  It was a project … [that] took place right around your leaving.  It was in weather mapping tools or some such product that I think you said was to map weather to be more efficient. … A few years ago they also made an online product called TruPoint Weather … I need to know where they originally put the locations in 2004 right as you were leaving…
>
> We had already renewed our contract in 2004 before we were aware that they had done that so we added a clause in the 2006 contract which basically stated that they could not use any information at all after the contract ended and that they were to have it all removed within 5 days of the termination.

(January 3 Emails; see also King Decl. ¶ 58 (stating that she learned, prior to the execution of the 2006 Agreement, that "portions of EMNI's Information" was being used in a new weather service system under development by TWC that was apparently still a behind-the-scenes project, but noting that she "saw no need to investigate the situation further because [she] believe[d] that should anything come from it in the future, [she] would be informed under the terms of EMNI's agreement with TWC, and so no further review of the situation was warranted.").)

Based on these materials, the Court finds that the record contradicts King's Declaration in paragraph 45 that she "first became aware of TWC's complained-of activity in 2011 when it was discovered that TWC not only continued

18

considering the apparent lack of any limitation placed on TWC's use of the Information or "any

portion thereof, in any form or format," with respect to event and attraction listings.  (Id.)  For

instance, Plaintiff has not averred that TWC would have been prohibited from displaying the

Coordinate Data alongside event and attraction listings on its website under the terms of the

Agreements.  Accordingly, the Court also finds that Plaintiff failed to take reasonable steps to

guard the secrecy of its Coordinate Data.

Further, Plaintiff's alleged efforts to maintain the secrecy of its Information with respect

to its previously published directory and on its website are similarly unavailing for its argument.

Plaintiff claims that the Information is only available in a limited format on its website.[12]

---

to use EMNI's information after termination of the 2006 Agreement, but TWC was misappropriating EMNI data for uses not anticipated by EMNI under the original 2002 Agreement or the final 2006 Agreement."  King's statement is apparently based on her 2011 Google and www.weather.com searches revealing usage of EMNI Information up to and including sometime in December 2011, (see King Decl. ¶ 46), and an email she received from Hanson in 2012, informing King that TWC had been misusing EMNI data as far back as 2002.  (See id. ¶ 52.)  Because it appears that the evidence actually suggests King was aware of TWC's conduct in 2006, the very same conduct EMNI presently considers unauthorized for purposes of this claim, the Court finds that the record does not substantiate King's statement in paragraph 45 of her declaration.  Instead, the evidence strongly indicates that EMNI was aware of TWC's "misuse" of location data and Coordinate data in other products and services possibly as early as 2002, but at least before the execution of the 2006 Agreement.

[12] The Court expresses concern regarding the dispute between Defendants and Plaintiff over how much of the Information was accessible on EMNI's website prior to the filing of this Motion.  The King Declaration reveals that at least after Defendants filed the instant Motion for Summary Judgment, Plaintiff's website restricted the number of results and searches that were available to users of its website.  (See King Decl. ¶ 18; Ex. A to King Decl., September 16, 2014, EMNI Website Search Screenshot.)  However, Plaintiff has not specifically alleged that the general public has never had access to all of EMNI's Information via its website.  (See King Decl. ¶ 18.)  The wording of Plaintiff's assertion in the King Declaration is relevant, as Defendants produced several exhibits with their original Motion, (see Ex. V to Forte Decl., June 22, 2014, EMNI Website Search Screenshot; Exs. R-S to Forte Decl., EMNI Website Screenshots from 2001, 2003), and additional exhibits with their Reply papers, (see Supp. Forte Decl. ¶¶ 4-34; Exs. A-K to Supp. Forte Decl.), showing evidence that EMNI's website did not limit search results prior to their filing the present Motion.

Defendants' position appears to be corroborated by other materials on the record which indicate that EMNI's website provided access to its database of Information to users who either were granted access to the site by registering for a username and password, or merely used the website after 2005.  (See King Dep. 10:18-11:2 (stating that access to EMNI's website was free after 2005, and all of EMNI's events and attractions data was on the website); id. 85:11-21 (noting that EMNI's Information licensed to clients, such as TWC, was the same Information that was available on EMNI's website); Ex. W to Forte Decl., July 12, 2014, Email from Maria King to Eli Wendkos (stating that "the database [TWC has] is a mirror image of what is on [EMNI's website]."); Ex. X to Forte Decl., July 6, 2005, Email from Maria King to Tim Bernas (describing how TWC could obtain a list of all of the malls (a category within Attraction Data) by registering for and using EMNI's website).)  While the Court need not resolve

Additionally, Plaintiff claims the Directory was only available in limited quantities, with limited information. The Court discusses the availability of this information in its printed and online form only as added support for its finding that Plaintiff failed to employ reasonable efforts to maintain the secrecy of the Information.

First, Plaintiff does not dispute that its Directory, the precursor to its digital database of the Information, was distributed to as many as 2500 subscribers, and contained "event names, dates, city and state [information], [and] a phone number for contact purposes." (Pl.'s Opp'n at 14-15.) Also, Plaintiff has not alleged that the information contained in the Directory was restricted or confidential. While the information may not have been delivered as widely as, say, the Atlanta Yellow Pages, it was sent to thousands of subscribers and contained over 800 pages of information. (Id.) Under the GTSA, "wide distribution of the allegedly confidential [ ] data removes any legal protection it might otherwise have had as trade secrets." Servicetrends, Inc, 870 F. Supp. at 1074. To the extent the Directory contained part of Plaintiff's trade secret, the Court finds that Plaintiff did not take reasonable measures to protect its secrecy.

With respect to the Information contained on EMNI's website, what separates the website from the Directory is the presence of full location addresses, including GPS coordinates and zip codes. (Pl.'s Opp'n at 14.) While EMNI maintains that no one can access all of its Information on the website, it does allow members of the public to search the Event Data and Attraction Data. (Id. at 16.) Event Data results are presently limited to a 50-mile radius of the zip code entered, and Attraction Data is limited to 99 results per search. (King Decl. ¶ 18.) Additionally, EMNI apparently also monitors its website usage to prevent users or specific IP addresses from running too many searches. (Id.) According to Plaintiff, the restrictions on the website are in

_____

this dispute for purposes of the present motion, it appears that that paragraph 18 of the King Declaration, and Exhibit A attached to the Declaration, are either firmly contradicted by the record, or are intentionally misleading.

place to prevent users from completely replicating all of EMNI's Event Data and Attraction Data.  (Pl.'s Opp'n at 16.)  However, it is not disputed that, even within the confines of EMNI's present search limitations, members of the public may access hundreds of results, including location information and Coordinate Data for events and attractions.  Nor has EMNI submitted that it restricts the amount of data available on its website to a very small portion of its Information in order to entice users to subscribe to a paid service in which the entirety of the Information becomes available, or that the limitations placed on searches prevent users from accessing any particular portion of its Information.  Viewed in this context, it does not appear that EMNI is providing its Information to "persons with whom [EMNI] has a confidential business relationship," Diamond Power, 540 F. Supp. 2d at 1333, and the Court cannot construe such public access to its Information as merely "some disclosure [that] is necessary for enjoyment of the benefits of [EMNI's] trade secret [while] not [ ] effectively destroy[ing] [its] secrecy."  (See Pls.'s Opp'n at 13.)

Perhaps it is worth noting that the rather tautological inquiry under the GTSA boils down to the question: "was this information truly a secret?"  AmeriGas Propane, 972 F. Supp. at 700. Prior to the enactment to the GTSA, under Georgia common law a trade secret was only protected where it was "known only to its owner and those of his employees to whom it must be confided in order to apply it to the uses intended."  Textile Rubber & Chem. Co. v. Shook, 255 S.E. 2d 705, 707 (Ga. 1979).  The facts of this case belie Plaintiff's contention that the Information was actually a trade secret.  Instead, it appears that EMNI has either publicly disclosed the majority of its Information in one form or another, placed it in the public domain, or disclosed the Information to its customers via liberal licensing agreements.  See Diamond Power, 540 F. Supp. 2d at 1332-33.  While it may have profited from its efforts spent compiling

the Information over time, Plaintiff cites no case which suggests that creating a valuable integration of information available in the public domain, and then making that integration of information available to customers and the public deserves trade secret protection.

Here, the mere presence of a confidentiality provision in the Agreements, and restricting the public to less than complete or universal access to EMNI's Information on its website and in its prior Directory is insufficient to support Plaintiff's position that it took reasonable measures to protect the secrecy of its Information.  Accordingly, Plaintiff cannot sustain a claim under the GTSA.  The Court will grant Defendants' Motion for Summary Judgment as to Counts I-III in the SAC.[13]

## B.    Plaintiff's Contract Claims (Counts IV-VI)

In Plaintiff's SAC it also alleges that Defendants breached their obligations under the contract both prior to and after the termination of the Agreements.  EMNI requests an injunction

---

[13] Additionally, the Coordinate Data appears to be readily ascertainable and easy to compile, which provides a further basis for granting Defendants' Motion for Summary Judgment on these Counts. While Plaintiff goes into some detail to explain why it was both costly and complicated to add the Coordinate Data to its database, it admits that obtaining the geo-coded location information was done by utilizing a free software service offered by Google. (Pl.'s Resp. ¶ 43.)  The crux of EMNI's argument is that the database of location information for the various events and attractions, which were used to obtain the Coordinate Data, was only obtained through the efforts of EMNI over many years, and was not generally known or readily ascertainable.  (See Pl.'s Opp'n at 9-11.)  Yet, this is the very Information that EMNI licensed for TWC's use under the Agreements, however, and as discussed supra, TWC had broad rights to publish and use that Information.  This is also data which EMNI acknowledges is not confidential on its own (see King Decl. ¶ 7), and could be obtained in large part through public records searches or use of the Internet.

Moreover, Georgia courts have largely given up protecting compilations of names and addresses under the GTSA, construing them as public information.  See AmeriGas Propane, 972 F. Supp. at 700 (citing Equifax, 453 S.E. 2d at 493).)  It appears that in light of the reasoning expressed by the Georgia Supreme Court in Leo Publications, Inc. v. Reid, 458 S.E. 2d 651 (Ga. 1995), Plaintiff's information is properly regarded as readily ascertainable by proper means.  See id. at 652 (finding that a list of advertising clients was readily ascertainable, and therefore not a protected trade secret, because it could be compiled by looking at the plaintiff's own publication to identify the clients, filling in the missing addresses using a telephone directory, and using that information to determine the contact persons and rates paid by each client by utilizing an experienced advertising executive); see also Capital Asset Research, 160 F.3d at 687 (denying trade secret protection where, in order to replicated  the alleged trade secret, one would need to access public tax records, consult newspapers, access private databases containing relevant information, physically observe the properties, consult payment records, and purchase local government computer records from other agencies).

against Defendants for any continuing post-termination breach, and enforce TWC's obligations under the Agreements, in Count V.  Further, EMNI seeks monetary damages for Defendants' alleged breach of its obligations both during and after the termination of the Agreements in Counts IV and VI.  For the reasons set forth below, the Court will grant Defendants' Motion as to Counts IV and VI, and deny Defendants' Motion as to Count V.

### 1.      Claim Seeking Injunction (Count V)

Plaintiff claims TWC has failed to comply with its post-termination obligations under the Agreements, which has caused irreparable harm and damage to EMNI, and it seeks injunctive relief enforcing all of TWC's post-termination obligations.  Both parties admit that the agreements required, upon termination, that TWC "cease to use all of the Information and erase all Information from [TWC] computer systems," within five days, (2008 Agreement ¶ 10(d)), and that TWC was "accord[ed] no right [ ] to use [EMNI's] Information, or the derivative work if that is dependent on the Information, subsequent to the termination of [the] Agreement."  (Id. ¶ 4.)[14]  The Court finds that Plaintiff has properly alleged that TWC breached the terms of the agreement by retaining and using the Information after the termination of the Contract, and EMNI suffers damages as a result of a continuing breach that may only be remedied through an injunction.  See Kuritzky v. Emory Univ., 669 S.E. 2d 179, 181 (Ga. Ct. App. 2008) (describing the elements for a breach of contract claim under Georgia law).

Defendants assert, in essence, that Plaintiff suffers no ongoing damage.  Because Plaintiff is seeking to prevent TWC from continuing to possess and use EMNI's data, and the evidence cited by Defendants seemingly indicates that TWC deleted all of EMNI's data and no longer

---

[14] Though the parties agree concerning the applicability of these provisions, the Court notes that the construction of contracts under Georgia law is a question of law for the Court.  See Ga. Code § 13-2-1.

uses it, Defendants contend the Court should grant their Motion on this Count.  In support,

Defendants' point to the testimony of Patrick Rouse and Sid Lane, which they argue

demonstrates that all of EMNI's data was deleted after the termination of the 2006 Agreement.

(See Rouse Dep. at 93:20-93:24, 102:13-16; Ex. C to Metzger Decl., Deposition of Sid Lane

("Lane Dep.") at 82:6-83:20; 84:23-85:2.)

   Plaintiff counters that there is at least still a genuine issue of material fact as to whether

TWC continues to use and possess EMNI's data in its systems.  (Pl.'s Opp'n at 36-39.)[15]  In so

arguing, Plaintiff offers evidence to discredit Defendants' own evidence showing that all of

EMNI's data was deleted from Defendants' database in December 2011.  While pointing out

some apparent inconsistencies in Defendants' evidence, more significantly, Plaintiff relies on the

Expert Report prepared by Digital Elysium in support of its argument that there remains some

question as to whether Defendants have in fact deleted all of the data from their database.  (See

Expert Report.)

   Though both parties agree that EMNI's experts did not inspect TWC's computers, the

Court considers this report sufficient to dispute a material fact.[16]  Plaintiff's Expert Report details

---

[15] Plaintiff's only support for its position that Defendant may have continued using the data after 2011 is the
speculation of King, whose declaration on this point is not based on personal knowledge.  (See King. Decl. ¶ 50.)
Fed. R. Civ. P. 56(c)(4) states that "[a]n affidavit or declaration used to support or oppose a motion must be made on
personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is
competent to testify on the matters stated"; see also Maldonado v. Ramirez, 75 F.2d 48, 51 (3d Cir. 1985) (noting
that an "affiant must ordinarily set forth facts, rather than opinions or conclusions"); Kirleis v. Dickie, McCamey
and Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009) ("[C]onclusory, self-serving affidavits are insufficient to
withstand a motion for summary judgment.")  Where the Declarant fails to provide a basis of knowledge for his or
her statement, a particular statement may be unsuitable for consideration upon a motion for summary judgment.
Bowen v. U.S. Dept. of Justice, 415 Fed. App'x 340, 345 n.4 (3d Cir. 2011) (citing SRC Joint Venture L.P. v.
Washawsky, 559 F.3d 133, 138 (2d Cir. 2009); see also Olivares v. United States, 447 Fed. App'x 347, 352 n.6 (3d
Cir. 2011) (noting that where a party provided no basis for his knowledge with respect to his responses to
interrogatories, "the unsupported assertions" were insufficient to imply the existence of a material fact) (citing
Patterson v. Ctny. of Oneida, N.Y., 375 F.3d 206, 219 (3d Cir. 2004) (stating that the "[Rule 56] requirement that
affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'")).
Accordingly, the Court considers this an insufficient basis for denying Defendants' Motion.

[16] The parties apparently disagree over whether EMNI ever submitted a discovery request seeking access to TWC's
"databases, systems and/or source code."  (Compare Pl.'s Supplemental Statement of Disputed Facts ("Pl.'s SSF") ¶

several possible additional locations of EMNI data not addressed by Defendants, why Rouse and Lane's description of the efforts to remove all of EMNI's data was less than exhaustive, the failure to address the possibility of backup materials, which are typical in the case of large databases, and the apparent failure of TWC to adequately track all of the sources of EMNI data which was entered into its systems, including updated feeds from EMNI.  (See id.)  Based on the limited information available, the Expert Report determined that it could not definitively conclude whether TWC had in fact deleted all of EMNI's data from its system.  (Id. ¶ 76.)

Defendants respond by insisting that because Plaintiff cannot confirm its suspicions without access to Defendants' database, it has failed to meet its burden to produce evidence that TWC continues to possess or to use EMNI's data.  (Defs.' Rep. at 14.)   The Court is unpersuaded by Defendants' reasoning.  It appears that TWC exclusively possesses the knowledge of to what extent EMNI's information has been removed from or remains in its system.  Moreover, the record is unclear as to whether EMNI ever requested this information, and if so, whether TWC failed to comply with such a request.  Under these circumstances the Court will not grant Defendants' Motion for Summary Judgment.  See Rolnick v. El Al Israel Airlines, Ltd., 551 F. Supp. 261, 264 (E.D.N.Y. 1982) (denying summary judgment where plaintiff had not been granted the opportunity to depose defendant's supervisor concerning the issue of ownership and control in a premises liability case, noting that its decision to do so

---

37 (asserting that access to this information was requested by EMNI during discovery, but never granted by TWC); with Defs.' Response to Pl.'s SSF ¶ 37 (disputing that EMNI submitted a discovery request seeking access to this information); see also Expert Report ¶ 72 (noting that EMNI counsel informed the experts that TWC "has repeatedly refused to produce copies of or allow access to their databases, systems, and source code."); id. ¶ 76 ("Because of [TWC's] lack of documentation regarding its copying and usage of [EMNI's] data and lack of cooperation in allowing [the experts] to inspect its systems, it is not possible for [the experts] to form a definitive expert opinion [on this matter]").)  While neither party supports its position with any citations to the record or additional submissions, the Court will credit Plaintiff's contention, as the Expert Report at least refers to Defendants' alleged failure to comply fully with Plaintiff's discovery request, and for the reasons discussed infra, the Court is disinclined to grant summary judgment for Defendants under the present circumstances.

"follows from the principle that summary judgment is inappropriate when, as here, a disputed fact is peculiarly within the knowledge of one of the parties.") (citing Schoenbaum v. Firstbrook, 405 F.2d 215, 218 (2d Cir. 1968)).

There remains an issue of fact concerning whether the actions undertaken by Rouse and Lane, as described in their testimony, were exhaustive in finding and removing the extent of EMNI's data on TWC's systems.  For this reason, the Court will deny Defendants' Motion for Summary Judgment as to Count V in the SAC.

### 2.      Claims Seeking Money Damages (Counts IV and VI)

Plaintiff also seeks monetary damages for breach of contract.  Defendants argue EMNI's claims for monetary damages in Counts IV and VI of its SAC are barred by the Limitation of Liability clause in the Agreements.  EMNI apparently accepts Defendants' facts regarding the scope and effect of the Limitation of Liability Provision. (Compare Defs.' SMF ¶¶ 19-22; with Pl.'s Resp. ¶¶ 19-22 (disputing paragraph 20 "to the extent the limitation of liability is interpreted to preclude either party from seeking monetary damages only for breach of contract").)

As noted above, the construction of contracts under Georgia law is a question of law for the Court.  See Ga. Code § 13-2-1.  With respect to exculpatory clauses, such as the Limitation of Liability provision at issue here, "absent a public policy interest, contracting parties are free to contract to waive numerous and substantial rights, including the right to seek recourse in event of a breach by the other [party]."  Imaging Systems Int'l, Inc. v. Magnetic Resonance Plus, Inc., 490 S.E. 2d 124, 128 (Ga. Ct. App. 1997); see Stefan Jewelers v. Electro–Protective Corp., 288 S.E. 2d 667, 669-70 (Ga. Ct. App. 1982) (waiver of any recovery for breach of contract not unconscionable).  Such provisions "severely restricting remedies act as exculpatory clauses and

therefore should be explicit, prominent, clear and unambiguous." <u>Imaging Systems</u>, 490 S.E.2d

124, 128; <u>see also</u> <u>Holmes v. Clear Channel Outdoor, Inc.</u>, 644 S.E.2d 311, 314 (Ga. Ct. App.

2007) (requiring exculpatory clauses to be explicit, clear, and unambiguous because they may

amount to an accord and satisfaction of future claims).

It appears to the Court that the Limitation of Liability clause in the Agreements was

unambiguous.  It is clearly labeled, with a bold heading, and the provision is written in all capital

letters.  <u>See</u> <u>Imaging Systems</u>, 490 S.E. 2d at 128.  The language in this paragraph specifically

provides:

> **Limitation of Liability**. EXCEPT WITH RESPECT TO
> LIABILITY ARISING FROM A PARTY'S INDEMNIFICATION
> OBLIGATION HEREUNDER, NEITHER PARTY HERETO
> SHALL BE LIABLE TO THE OTHER FOR DIRECT, INDIRECT,
> INCIDENTAL, CONSEQUENTIAL, SPECIAL OR
> EXEMPLARY DAMAGES (EVEN IF SUCH PARTY HAS BEEN
> ADVISED OF THE POSSIBILITY FOR SUCH DAMAGES
> SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR
> ANTICIPATED PROFITS OR LOSS OF BUSINESS.

(Defs.' SMF ¶ 19.)  Such a limitation would seemingly apply to any "[a]ward of damages

resulting from [TWC's] pre-termination breach of the Agreements," and any "[a]ward of

damages resulting from [TWC's] post-termination breach of the Agreements."  (SAC, Prayer for

Relief ¶¶ 4-5.)

Plaintiff has not argued that the term is ambiguous or violative of public policy, only that

it should not bar EMNI's claims under the GTSA.  (<u>See</u> Pl.'s Opp'n at 39-40.)  However,

Defendants' simply assert that Plaintiff's <u>breach of contract claims</u> seeking money damages are

barred by the Limitation of Liability provision.  (<u>See</u> Defs.' Br. at 29-33; Defs.' Rep. at 1.)  Nor

has Plaintiff argued that this provision was unconscionable, and the record shows that EMNI

included similar provisions in agreements drafted and entered into with other EMNI clients.  (<u>Id.</u>

¶ 22.)  Accordingly, the Court can find no dispute as to whether the Limitation of Liability clause bars Plaintiff's claims in Counts IV and VI.

For these reasons, the Court will grant Defendants Motion for Summary Judgment as to Counts IV and VI in the SAC.

## IV.     CONCLUSION

For the reasons expressed above, Defendants' Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**.  The Court will grant Defendants' Motion for Summary Judgment as to Counts I-IV and VI in the Second Amended Complaint, and deny their Motion as to Count V in the Second Amended Complaint.  An appropriate Order shall enter.


Dated:   2/3/2015                                                 s/ Robert B. Kugler
                                                                  ROBERT B. KUGLER
                                                                  United States District Judge